## MAX GREENSTEIN & another[1] vs. THOMAS J. FLATLEY & another.[2]

Middlesex. November 8, 1984. — February 14, 1985.

Present: GRANT, KAPLAN, & KASS, JJ.

*Landlord and Tenant,* Execution of lease. *Estoppel. Agency,* Scope of authority or employment. *Consumer Protection Act,* Lease, Unfair practice.

Where, although an agent of the owner of an office building was without real or apparent authority to sign contracts for the owner, the agent had, with apparent authority and in furtherance of the owner's business interests, led the plaintiffs to believe that they had a lease for an office suite, and where the plaintiffs had reasonably relied to their detriment on the agent's representations before the owner declared an intention not to go forward with the transaction, the owner was liable to the plaintiffs on a claim under G. L. c. 93A, the Consumer Protection Act. [354-358]

On a claim under G. L. c. 93A, alleging that the owner of an office building acted unfairly and deceptively by leading the plaintiffs to think they had a lease for an office suite and then disavowing the existence of such a lease one month before its scheduled commencement, there was sufficient evidence to warrant the judge's award of both compensatory damages, computed on the basis of (1) the plaintiffs' out-of-pocket costs attendant on their anticipated move and the eventual abandonment of that move and (2) the incremental cost which the plaintiffs incurred in renting comparable space, as well as punitive damages, based on the allowable inference that the defendants' conduct was not the result of an oversight but was an intentional course of action. [358]

CIVIL ACTION commenced in the Superior Court Department on July 3, 1980.

The case was heard by *Edith W. Fine,* J.

*Kenneth A. Sweder* for the defendants.

*Geoffrey D. Wyler* for the plaintiffs.

---

[1] Harvey Greenstein.

[2] Thomas Gibbs.

KASS, J. Thomas J. Flatley, at all times material, owned an office building at 18 Tremont Street, Boston. He appeals from a judgment[3] against him on a c. 93A complaint which alleged that Flatley acted unfairly and deceptively by leading the plaintiffs to think they had a lease for an office suite and disavowing the existence of such a lease one month before its scheduled commencement.

We rehearse (with slight supplement from the record) the salient facts found by the trial judge, which we leave undisturbed in the absence of clear error. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). See *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 675 (1977). The plaintiffs are partners in a firm of certified public accountants, Cohen, Greenstein and Company. During the summer of 1979, Harvey Greenstein (Greenstein), on behalf of the firm, began looking for office space larger than the premises they then occupied as tenants at will. Greenstein inquired at 18 Tremont Street of Thomas J. Gibbs, who was the Boston property manager for Flatley.[4] Gibbs showed Greenstein suite 1033, which contained approximately 1,500 square feet. By September, 1979, negotiations had progressed sufficiently so that Greenstein submitted to Gibbs, for forwarding to Flatley, a written letter of intent.

That letter brought forth from the Flatley home office in Braintree a lease on a printed form published by the Greater Boston Real Estate Board, with typed material filled in, typed addenda, and a floor plan as an annexed exhibit. The document provided for a lease term of seven years at an annual rent of $13,500 to be adjusted, after measurement of the premises, on the basis of nine dollars per square foot. The commencement date was left blank on the lease form submitted. Gibbs invited Greenstein to sign the lease. More particularly, some time before October 30, 1979, Gibbs told Greenstein that when he, Greenstein, signed the lease, there would be a deal. On Octo-

[3] $52,000 in damages, plus $8,112.11 in legal fees and costs and $21,996 in interest as of the date upon which judgment was entered, November 14, 1983.

[4] Flatley at the time owned and operated two office buildings in Boston: 18 Tremont Street and 27 School Street.

ber 30, 1979, Greenstein delivered to Gibbs four counterparts of the lease signed by him, together with a notice of lease similarly signed by him. Gibbs indicated that the papers would be forwarded to Flatley for countersignature and, indeed, they were.

Timing was of some consequence to the plaintiffs. January 1st to April 15th was "tax season" and not an opportune time for accountants to move. In an effort to accommodate to that exigency, Gibbs, on November 8, 1979, wrote to Greenstein that Flatley would use its[5] best efforts to make the space ready for occupancy by January 10, 1980. Roughly a month later, on December 3, 1979, Gibbs wrote to Greenstein with the bad news that Flatley could not get the space ready until March, 1980. He offered Greenstein choices: he could "negate the lease" or he could accept April 15th as an occupancy date. Greenstein chose April 15th occupancy. While all this was going on, a decorator employed by Flatley worked with the plaintiffs on details of space design and décor (paint, wallpaper, rugs, etc.). By letter dated December 10, 1979, Gibbs wrote to Greenstein on the letterhead of the Flatley office in Braintree:

> "As you requested, the lease agreement by and between Thomas J. Flatley . . . and Cohen, Greenstein and Company, as Lessee dated October 30, 1979, for the premises described as Suite # 1033, located at 18 Tremont Street, Boston . . . is hereby amended as follows:

>> The term of said lease shall be for Seven (7) years commencing on April 15, 1980 and ending on March 14, 1986.
>> All other terms, conditions and covenants of the original lease agreement shall remain in full force and effect and are hereby reaffirmed.

> Please indicate your assent by signing below and returning three copies to my attention."

---

[5] The use of the neuter gender reflected that Flatley did business as The Flatley Company.

The letter was signed: "The Flatley Company/T.A. Gibbs/Boston Property Manager." Greenstein promptly indicated his assent to the document from The Flatley Company by returning three countersigned copies to Gibbs.

On or about January 24, 1980, at Gibbs' request, Greenstein executed superseding lease forms, in four counterparts, showing the premises to contain 1,484 square feet and providing for an annual rent of $13,356. In reliance on representations that he would have the space in 18 Tremont Street, Greenstein took no steps to find other office space. The plaintiffs were required to vacate the offices they then occupied on April 30, 1980. On February 15, 1980, Greenstein wrote Gibbs that phones would be installed on April 21, 1980, and that his firm would move in on April 24th. In the same letter, Greenstein asked, as he had on previous occasions, for a countersigned copy of the lease he had signed and sent to Flatley. Gibbs' response, made orally, to these requests was that the lease was in Braintree.

Not until mid-March did Greenstein get a precise response to his request for a signed lease. It was an unwelcome one. By letter dated March 13, 1980, on The Flatley Company letterhead and signed "Cordially, The Flatley Company" Gibbs sent the following ungenial message: "I have presented the proposed lease to my Lease Committee and they have determined at this time that they cannot accept the proposed lease. I thank you for your interest in 18 Tremont Street." By rejecting the plaintiffs, Flatley was able to make a more advantageous deal for the tenth floor space which the plaintiffs would have occupied by leasing the entire east wing of the tenth floor to Little, Brown & Co., an existing tenant. By renting space in bulk, Flatley was able to include corridors and interior walls as parts of the leased premises.

Gibbs, the judge found, was not authorized to sign leases. She did find, however, that he had "authority and apparent authority to negotiate and deal generally, orally and in writing, with tenants and prospective tenants and to carry out all the usual duties of a property manager."

Flatley pegs his defense on paragraph 22A of the lease, drafted and submitted by him to the plaintiffs, which provides: "The acceptance of a security deposit and or the submission of this lease for examination does not constitute a reservation of, or option for the Premises, and shall vest no right in any party." The construction which Flatley attributes to this language — that a tenant has no rights under a lease until Flatley himself countersigns the document his organization has proffered — is not an inevitable one. Certainly it is an oblique way of saying so.[6] Indeed, such a provision would be contrary to G. L. c. 186, § 15D, which requires a lessor who has agreed orally to execute a lease and who has obtained a signed lease from a lessee to deliver a countersigned copy to the lessee on pain of a $300 fine. By its terms § 15D declares void any waiver of the command of the statute. As the judge determined that Gibbs was not cloaked with authority or apparent authority to sign leases, there was no finding, nor did the evidence support one, that Flatley had agreed orally to execute the lease.

Acquisition of a leasehold estate greater than a tenancy at will requires an instrument in writing signed by the grantor or his attorney. G. L. c. 183, § 3. *Chester A. Baker, Inc.* v. *Shea Dry Cleaners, Inc.*, 322 Mass. 311, 312-313 (1948). Schwartz, Lease Drafting in Massachusetts § 1.3 (1961). That Flatley never signed the Greenstein lease would, therefore, be a fact to conjure with were the plaintiffs asserting a right to possession under the lease. At that, the instrument of December 10, 1979, purporting to amend the lease of October 30, 1979, signed on behalf of The Flatley Company, written on a letterhead of The Flatley Company and bearing the home office address, would present some difficulty for the defendant. The test for apparent authority is how the person dealing with the agent reasonably interprets the agent's authority. See *Kanavos* v. *Hancock Bank & Trust Co.*, 14 Mass. App. Ct. 326, 331-332 (1982); Restate-

---

[6] Compare the more straightforward language considered in *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 723-724 (1974): "This agreement . . . is binding upon Buyer . . . only when executed by an official of Buyer, regardless of any written or verbal representation of any agent, manager or other employee of Buyer to the contrary."

ment (Second) of Agency §§ 8, 27 & 49 (1957). On the view we take of the case, we need not decide whether Flatley was bound by the December 10 document. We proceed on the basis that the trial judge was correct in her mixed determination of fact and law that Gibbs was without apparent authority to bind Flatley on a lease.

Although the complaint asserted rights under a lease as an alternate basis for recovery of damages, the ground on which the plaintiffs won was that Flatley was liable under G. L. c. 93A. It is on that basis that we proceed to analyze the case. Factually the case is evocative of *Cellucci* v. *Sun Oil Co.,* 2 Mass. App. Ct. 722 (1974). In *Cellucci,* as in the present case, the agent was without real or apparent authority to sign contracts for the company. There, as here, the plaintiff had executed the contract; the agent had, with apparent authority and in furtherance of the company's business interests, led him to believe that the deal was as good as made; and the plaintiff had reasonably relied to his detriment on the agent's representations before the company declared its intention not to go forward with the transaction.

We found the circumstances in *Cellucci* to work an estoppel, i.e., the pattern of conduct of the defendant and its agents, was calculated to misrepresent the true situation to the plaintiff, keep him on a string, and make the plaintiff conclude — reasonably — that the deal had been made and that only a bureaucratic formality remained.[7] So here. Because the conduct of The Flatley Company, of which the defendant Flatley is the sole proprietor, was misleading, it fits comfortably "within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *PMP Associates, Inc.* v. *Globe Newspaper Co.,* 366 Mass. 593, 596 (1975). It is not even necessary that the conduct complained of fit into a precise tort or contract niche, *Slaney* v. *Westwood Auto, Inc.,* 366 Mass. 688, 693 (1975), although the case at bar presents an identifiable occasion for applying the principle of promissory

---

[7] For a statement of the applicable principle, see Restatement (Second) of Contracts § 129 (1981).

estoppel. That principle affords recovery based on "a manifestation of intention to act . . . in a specified way, so made as to justify a promisee in understanding that a commitment has been made," Restatement (Second) of Contracts § 2 (1981), "which the promisor [i.e., the party who does the manifesting] should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance." Restatement (Second) of Contracts § 90 (1981). See *Loranger Constr. Corp.* v. *E. F. Hauserman Co.,* 6 Mass. App. Ct. 152, 154-159 (1978), wherein this court expounded and employed the doctrine. Upon further appellate review, at 376 Mass. 757, 760-761 (1978), the Supreme Judicial Court, in an opinion by Justice Braucher, threw cold water on the expression "promissory estoppel," but not on the principle. See also *Hoffman* v. *Red Owl Stores, Inc.,* 26 Wis. 2d 683 (1965). There, the agent for Red Owl, a grocery store chain, led the plaintiffs to sell real estate and give up two businesses on their reasonable understanding that Red Owl had agreed to construct, equip, and stock a store in which the plaintiffs could operate as Red Owl franchisees. After a long course of dealing, qualitatively resembling that in the case at bar, Red Owl introduced capital requirements which were substantially stiffer than it had earlier specified and which the plaintiffs could not meet.

Faced with a sudden and urgent need for office space, the Greensteins signed a five-year lease at 111 Devonshire Street at a rent based on $12 per square foot, against the $9 per square foot which applied to the space at 18 Tremont Street. The judge computed her award of compensatory damages of $26,000 on: (1) the plaintiffs' out-of-pocket costs attendant on the anticipated move to 18 Tremont Street and the eventual aborting of that move; and (2) the incremental cost which the plaintiffs incurred in renting comparable space. Flatley argues that the damages were not supported by competent evidence. At the most, his attack bears on the weight to be given the evidence, which came in through testimony from Greenstein and a real estate expert. To the extent their evidence was unconvincing, that was a matter to be shown by cross-examina-

tion. See *Southwick* v. *Massachusetts Turnpike Authy.*, 339 Mass. 666, 670-671 (1959). That the judge ascribed only measured weight to the evidence adduced by the plaintiffs is apparent. Their itemized damages added up to $47,368.

Beyond compensating damages, Flatley protests that he should not be charged with punitive damages (i.e., the double damages assessed) absent a finding of actual knowledge of Gibbs' actions that would have imposed a duty on Flatley to speak. We think that the trial judge was entitled to infer that Flatley's conduct was not based on oversight but was an intentional course of action, taken to maintain his options despite Greenstein's predictable reliance on the existence of a deal. At the least, Flatley was responsible for his failure to keep himself informed of the conduct of his agent, in whom he reposed substantial negotiating authority, in connection with a common type of transaction within the scope of his agency. Instead, Flatley and his agent led the plaintiffs across the Rubicon, and then told them to fish. It was conduct beyond the toleration even of persons inured to the rough and tumble of the world of commerce. See *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). On the view we have taken of the case, it is unnecessary to consider the plaintiffs' cross appeals from the judgment dismissing the claim against Gibbs (the judge found that he had acted in the belief that Flatley would sign the lease) and from the dismissal of the claim against Flatley based on the existence of a binding lease between Flatley and the plaintiffs. For the same reason we need not consider the plaintiffs' motion, made after argument, for leave to enter those cross appeals late.

*Judgments affirmed.*