PETER WASSERMAN *vs.* IRENE AGNASTOPOULOS.

Middlesex.    April 9, 1985. — August 28, 1986.

Present: ARMSTRONG, KAPLAN, & KASS, JJ.

*Consumer Protection Act,* Businessman's claim, Unfair act or practice, Lease, Damages, Attorney's fees. *Landlord and Tenant,* Execution of lease. *Agency,* Scope of authority or employment. *Damages,* Consumer protection case.

Where, during a period of several months, the tenant of certain restaurant premises, reasonably relying on the actions and assurances of an individual with whom she had been accustomed to transacting business as the owner's trustee and representative, had secured a prospective new tenant for the premises, had discontinued her business, and had concluded an agreement with the prospective tenant for purchase of her equipment and furnishings, the subsequent conduct of a new owner, who had not previously disclosed that he had acquired title under an unrecorded deed, in disavowing the course of dealing of which he had been aware and in refusing to execute the lease which had been negotiated with the prospective tenant, could properly be held to have violated his duty of fair dealing toward the original tenant, which he owed her by virtue of G. L. c. 93A, § 2(*a*). [677-680]

Although certain conduct by an owner of commercial premises was violative of the duty of fair dealing which he owed his tenant by virtue of G. L. c. 93A, § 2(*a*), the owner's actions could not, in the circumstances, fairly be characterized as wilful and knowing violations entitling the tenant to recover twice her actual damages under the penalty provisions of G. L. c. 93A, § 11. [680-681]

COMPLAINT for summary process filed in the Cambridge Division of the District Court Department on August 21, 1980.

On removal to the Superior Court Department the case was heard by *John Paul Sullivan,* J.

*John M. Connolly (W. Arthur Garrity, III,* with him) for the plaintiff.

*George P. Butler, III,* for the defendant.

ARMSTRONG, J. Peter Wasserman, who brought this action for eviction and rent arrearages, appeals from a judgment entered against him in the amount of $52,300 plus attorney's fees on the defendant's counterclaim. The case was tried to a judge sitting without a jury, who made careful findings which, as slightly amplified by reference to the supporting evidence, we recount.

In 1977 the defendant, Irene Agnastopoulos,[1] with the assistance of her father and sister, started a restaurant, Porter Square Seafood, on Massachusetts Avenue in Cambridge. The Agnastopouloses obtained the restaurant premises on a ten-year lease,[2] at a fixed $1,400 per month rental, from the trustees of "Leonard Trust," the controlling force behind which was one Max Wasserman, the father of the plaintiff.[3] The person who acted as rent collector and manager of the property was one Michael Coyne, who was one of the three trustees of the Leonard Trust.

From 1977 until it closed on February 29, 1980, the restaurant operated at a loss. On occasion the rent was not paid on time. A letter would arrive, on Leonard Trust stationery, signed by Michael Coyne, trustee, threatening eviction. Such letters were sent on February 15, 1979, April 17, 1979, and January 9, 1980. While sometimes late, the rent was always paid (at least through January of 1980). The rent checks were made out to Leonard Trust. They would come back with the endorsement, "For deposit only. Leonard Trust."

In the closing months of 1979, the Agnastopouloses were ready to call it quits, and Irene asked a broker to look for a

---

[1] As often as not, the defendant's name appears in the record as Irene Anagnostou. This variation is not explained.

[2] The typewritten portion of the lease names the lessee as Nicholas Agnastopoulos (the defendant's father), but it is signed by Irene Agnastopoulos (see n.1) as lessee, rather than by the father. The judge makes a finding that Irene was at all times the actual owner of the business.

[3] Max was the primary beneficiary of the Leonard Trust; the settlor was his wife Jeanne. The record indicates that Max in effect controlled the trust. The terms of the Agnastopoulos lease were worked out with Max, together with William Kent, one of the trustees.

buyer for the business. In December she delivered the rent check in person to the Leonard Trust office. Max Wasserman was there (Coyne was away), and she spoke to him about her problems. He told her that if she found a prospective buyer she should "send him up" to the office. In late December a broker produced a prospect named Kek Cheng Chang, who was interested in buying the business from Irene Agnastopoulos and converting it to a Chinese restaurant. Seeing that Chang was a serious prospect, Irene put him in touch with the Leonard Trust people in late December or early January. In early January Irene's father suffered a heart attack and was thereafter incapacitated from working in the restaurant, doubtless firming her resolve to complete a sale if possible. She and Chang were in tentative agreement on the sale, awaiting the lease arrangements with Leonard Trust to be worked out.

On February 22, 1980, Irene was told both by Chang and by Michael Coyne that a lease arrangement had been worked out agreeable to both parties. On the same date Michael Coyne sent a copy of the proposed lease to Chang's attorney. It was a ten-year lease and provided for the rental of $1,400 per month during the first seven years (the remaining seven years of the Agnastopoulos lease) and $1,600 per month in the final three years. The attorney was to have his client sign the lease and return it to Michael Coyne with a check for $4,200 (one month's rent and two months' security deposit). "Upon receipt," the cover letter said, "a signed executed copy by the LESSOR will be returned to you or your clients as directed." The cover letter was on Leonard Trust stationery. It was signed, "The Leonard Trust, by Michael J. Coyne, trustee." The lessor named in the lease was "The Leonard Trust."

A week later, on February 29, 1980, Chang and the Agnastopouloses signed a purchase and sale agreement for the business and all of its equipment and furnishings. The purchase price was $40,000. The Agnastopouloses were responsible for paying all debts of the business. The passing of papers was to be at the end of March, but Irene agreed to close down the business immediately so that Chang could remodel the premises during March, in anticipation of an April opening of the Chinese

restaurant. The agreement was made contingent on the signing of a ten-year lease of the restaurant premises satisfactory to Chang. Damages were to be liquidated at $2,000 (paid February 29, as a deposit) in the event Chang should default. In reliance on this agreement, Porter Square Seafood closed its doors for the last time on February 29, 1980. The contemplated sale to Chang, however, was about to be derailed.

Unbeknownst to Chang and the Agnastopouloses, almost a year before, on March 15, 1979, Michael Coyne, acting as trustee of the Leonard Trust,[4] at the behest of Max Wasserman and his wife (see note 3, *supra*), had executed a deed transferring the restaurant premises to the plaintiff Peter Wasserman. The transfer was part of a large property settlement apparently worked out in the aftermath of the decision in *Wasserman* v. *Wasserman,* 7 Mass. App. Ct. 167 (1979).[5] The memorandum of settlement called for the deed to be executed immediately and for Peter to manage the property, "subject to the terms of the leases." It also provided that the rental payments were to be collected by Max and expenses paid by him up to August 15, 1980, at which time Peter would take over the full management responsibility and would in his own name collect all rents. It further stated that Peter was to have a "right of veto over new tenants, to be exercised reasonably." The deed transferring the property had not been recorded. This was intentional, although the reason is not explained on the record before us. (The deed was not actually recorded until some time in 1981).

On March 1, 1980, Peter returned from a vacation and learned of Michael Coyne's dealings with Chang and the Ag-

---

[4] He was acting for himself and his cotrustees under a delegation of powers dated August 23, 1977, recorded in the South Middlesex Registry District of the Land Court.

[5] By that decision Peter had blocked his parents from reneging on steps they had taken to give him a controlling interest in certain of their labyrinthine business affairs, and the parents had been ordered to make an accounting to a family partnership (of which Peter had been declared the sole general partner over Max's claim to be such). The memorandum of agreement indicates that Peter waived his right under this court's decision to an accounting from Max and Jeanne.

nastopouloses. He was angry with Coyne for having allowed matters to proceed so far without consulting him. His plans for the property, he said, called for a French restaurant or possibly Italian — not Chinese. Peter dispatched three letters on March 10 (to Irene and her father at home and at the restaurant, and to Chang's attorney) asserting his ownership of the building and the necessity for any lease arrangement to be approved by him. He told Irene of his aversion to Chinese restaurants based on a previous experience. Nevertheless, he arranged for Chang to meet with him. Peter sought agreement on several points as to which the landlord had some say under the existing leases (the Agnastopoulos lease and the proposed Chang lease), such as garbage disposal and cooking exhaust controls. He also made demands that would require renegotiation, such as a substantially higher rental ($1,400 per month for three years, $1,900 for the next three, and $2,500 for the final four), exterior sign control by the landlord, and possibly the purchase of a liquor license held by Peter for $30,000. Chang came away from the meeting convinced that Peter did not like him and that they would find it difficult to reach an agreement. A letter from Peter to Chang's attorney on May 24, 1980, indicates a breakdown of negotiations (although it ostensibly leaves the door open to further talks). Invoking the condition in the purchase and sale agreement, Chang sought and received his $2,000 deposit back from Irene Agnastopoulos.

Irene made no attempt thereafter to reopen the restaurant. She had many debts, and she claimed to be unable to invest the capital necessary to begin again. A restaurant owner Peter found offered to buy Irene's kitchen equipment for $5,000. She rejected the offer. A refrigeration company which was her principal creditor repossessed all her equipment and perhaps furnishings; she testified that that discharged her ($6,500) debt. The record does not disclose with any certainty whether anything of value remained on the premises.

Chang apparently sued Peter Wasserman, but so far as the record indicates nothing came of it. The premises remained vacant, and Irene paid no further rent. In July Peter's attorney sent Irene a notice to quit. In August suit was brought in Peter's

name to recover the premises and to collect back rent to December, 1979. Irene surrendered possession without protest; she asserted that she had paid the rent through March, 1980 (counting her security deposit), and denied liability for rent thereafter. The judge accepted that and ordered judgment for Irene on Peter's claim. On the counterclaim by Irene against Peter, the judge computed Irene's actual loss as follows: the purchase price negotiated with Chang, $40,000, less the broker's commission and indebtedness on equipment which was to have been included in the sale, $5,000 and $8,850 respectively, for a net loss of $26,150. On a theory of recovery under G. L. c. 93A, § 11, he awarded double damages, or $52,300, plus attorney's fees and expenses of $10,000 and $1,082.29 respectively.

On the view we take, it will be unnecessary to discuss much of what has been argued in this well-briefed case. We agree with the judge that the action of Peter Wasserman constituted a violation of the standard of conduct set out in G. L. c. 93A, § 2(a). We need not focus directly on the ground relied upon by the judge. We are satisfied on the findings that Peter's actions were unfair and overbearing to Irene, who had justifiably placed reliance on the actions of a person, Coyne, who Peter had allowed her to think had authority to act with respect to the lease.

The Agnastopouloses, prior to negotiations with Chang, had had only one indication of Peter's involvement. In late December, after Irene had talked to Max about selling the business, a letter arrived addressed to Irene's father, signed "Peter Wasserman, Manager." The letter stated that Peter agreed to allow the father to terminate the lease as of July 1, 1980, earlier if a suitable new tenant could be found before then. There was a space for the father to sign his assent to "the leasing commitments and release described above." Irene was confused and telephoned Peter. She testified that he did not divulge that he was the owner. He testified that he did, but the judge did not have to believe him. Michael Coyne continued to act as if he had the authority to negotiate with respect to the lease. So far as appears, Irene Agnastopoulos had no reason to know of the conflict between Peter on the one hand and

Max and his trusted agent Coyne on the other.[6] By signing as "manager," Peter did not say or even suggest that he was the owner. Irene's lease was with Leonard Trust; her rent was paid to and accepted by Leonard Trust; the record owner of the property was Leonard Trust. The Leonard Trust was, in effect, Max. Irene was entirely justified in thinking that her dealings and Chang's had to be with Max or Coyne because, on the judge's findings, Peter permitted her so to think. When Coyne told her and Chang that the lease terms had been approved and that the Chang lease would be signed by the trust on receipt of a signed copy and security deposit, she and Chang had every reason to believe that the execution was a formality. Compare *Cellucci* v. *Sun Oil Co.,* 2 Mass. App. Ct. 722, 729-730 (1974); *Greenstein* v. *Flatley,* 19 Mass. App. Ct. 351, 352, 356 (1985).

We do not suggest that Peter Wasserman was bound by Coyne's acts alone to approve the lease terms Coyne had negotiated. Chang had not yet signed and returned the lease, and, if he had, it would still be a mere offer until signed by the lessor. *Cellucci, supra* at 727. Here, however, other considerations, equitable in nature, bore on Peter's obligations. Max, Coyne, and Peter himself all understood that Porter Square Seafood was in distress and that the principal purpose of the Chang lease was to permit Irene to sell the business. It was clear that the business could not be sold until the lease had been worked out, and it is equally obvious that Michael Coyne understood that the time frame was short. (The draft lease to Chang was by its terms to take effect March 1, 1980.) When Coyne indicated the trust's approval of the lease terms on February 22, 1980, he should have anticipated that Irene and Chang would rely on that approval without significant delay. They in fact did so, executing the agreement for the sale of the business on February 29. In reliance thereon, Irene closed down Porter Square Seafood the same day. (The evi-

---

[6] The trusted status of Coyne in Max's business operations is evident, not only from his being a trustee of the Leonard Trust and having been delegated authority to act for all the trustees, but also from the provisions made in the settlement agreement between Peter and his parents to protect Coyne's income in the event Peter should discontinue his services.

dence indicated that food and other supplies had been allowed to dwindle during the final weeks of February in anticipation of the agreement.)

When Peter arrived on the scene in early March, he, as the owner, exercised his asserted legal right to revoke Coyne's apparent authority and to refuse to enter into the lease that Coyne had negotiated. Under the standard set by G. L. c. 93A, § 2(*a*), however, one may be constrained in the exercise of his common law rights by considerations of fairness imposed by the statute. It has been held, generally, that for conduct to violate the standard of § 2(*a*), (1) it must fall "within at least the penumbra of some common-law, statutory, or other established concept of unfairness," (2) it must be unethical or unscrupulous, and (3) it must cause substantial injury to a consumer or another businessman. *PMP Associates, Inc.* v. *Globe Newspaper Co.,* 366 Mass. 593, 596 (1975). The second factor does not contemplate an overly precious standard of ethical or moral behavior. It is the standard of the commerical market place, and it has been said, accordingly, that conduct does not qualify as "unethical" or "unscrupulous" unless it "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings* v. *Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, 504 (1979).

The *Cellucci* case, 2 Mass. App. Ct. at 732-734, held that in compelling circumstances reasonable reliance on the actions and assurances of a negotiating agent may estop his principal from refusing to execute a negotiated agreement, although the agent had neither actual nor apparent authority to bind his principal to the agreement. Here, as in *Greenstein* v. *Flatley,* 19 Mass. App. Ct. at 356, it is not necessary to decide for purposes of G. L. c. 93A whether the negotiating agent had authority to contract; the factual similarities between both cases and the *Cellucci* case are such as to bring them within the penumbra of the common law principles applied in *Cellucci.* We cannot say that in the circumstances the conduct of Peter Wasserman upon his return from vacation was as matter of law not unethical or unscrupulous. On the judge's findings, Peter knew that Irene

Agnastopoulos and Chang were ignorant of the necessity for his approval of the lease; he knew that Irene was dealing with Max and Michael Coyne, thinking that she was dealing with the owner of the premises; he knew that Coyne had given Chang and the Agnastopouloses to understand that the lease was assured (implying that they might proceed with the sale of the business); and he either knew, or should on minimal inquiry have learned, that the second agreement had been reached on the strength of the first and that Porter Square Seafood had been closed. The judge did not err in concluding that Peter had violated the standard of fairness imposed by G. L. c. 93A, § 2(*a*), in pulling the rug out from under the sale of the business.

Important to this conclusion is the fact that Irene Agnastopoulos had been scrupulous from the outset in keeping the Wassermans and Coyne fully apprised of her situation and her negotiations with Chang and in putting Chang directly in touch with Coyne. Peter chose instead to keep his position secret. This he had a lawful right to do; but the evolving standard of fairness and good faith in business dealings mandated by c. 93A precluded his thereafter using disclosure to sabotage the sale of the business without assuming a responsibility for the changed situation of Irene Agnastopoulos. Certainly there was no error in finding that the restaurant was closed in reliance on the agreement for the sale of the business and that the closing was detrimental to its value.

In our view, however, Peter Wasserman's conduct was not such as to warrant a doubling of damages under G. L. c. 93A, § 11. Damages are to be doubled (or trebled) under that section where "the act or practice was a willful or knowing violation of section two." There is nothing in the record to suggest that Peter Wasserman's concealment of his ownership was intended to prejudice the Agnastopouloses; rather, the source of the misunderstanding lay in his failure to clarify the authority of Michael Coyne after the transfer of ownership in 1979. Violations of § 2 having their origin in negligence are not generally regarded as warranting penalty damages. See *Linthicum* v. *Archambault,* 379 Mass. 381, 388 (1979); *Shaw* v. *Rodman*

*Ford Truck Center, Inc.,* 19 Mass. App. Ct. 709, 711-712 (1985). See also *International Fid. Ins. Co.* v. *Wilson,* 387 Mass. 841, 854-855 (1983).

Peter Wasserman's decision not to honor the lease agreement negotiated by Coyne was an intentional and knowing act, but that decision by itself is not the basis for the imposition of liability. Contrast the *Cellucci* and *Greenstein* cases, in which the plaintiffs had executed contracts, returned them to the defendants, and relied on assurances that the defendants' signatures were a mere formality. On the facts found here Peter Wasserman was not obliged to enter into a ten-year lease with Chang inconsistent with his property improvement plans. Chang had not executed the lease or relied to his detriment on the assurance that the lease would be signed by the lessor. Rather, Peter Wasserman's duty ran to the Agnastopouloses, with whom he had "an implied covenant of good faith and fair dealings," *Druker* v. *Roland Wm. Jutras Associates, Inc.,* 370 Mass. 383, 385 (1976), to make them whole for the injury they suffered in reasonable reliance on assurances of Coyne. Peter Wasserman's duty in that respect was not so clear that a court could fairly characterize his omission as a wilful or knowing violation of § 2. This is not a case involving the intentional employment of sharp practices; rather it is one in which an otherwise justifiable business decision entailed, as an unintentional and presumably unwanted side effect, injury to one protected by the statute. The penalty provision of § 11 contemplates a more purposeful level of culpability. *International Fid. Ins. Co.* v. *Wilson,* 387 Mass. at 853-854, 855. Accordingly, the judgment must be amended to eliminate penalty damages.

We mention the following points raised in the briefs: (1) The judge did not err in denying Peter Wasserman's claim for rent for the period in which Chang would have been responsible for rent if the lease had been executed as negotiated. (2) The evidence fully warranted a finding that Chang would have executed the lease if Peter Wasserman had not repudiated it. (3) There would have been no sound basis for limiting Irene Agnastopoulos's damages against Peter Wasserman to the

amount agreed to between Irene Agnastopoulos and Chang as liquidated damages in the event of breach by Chang. (4) On all the evidence the judge could properly infer that, after Porter Square Seafood was closed and its major equipment repossessed, it had substantially lost whatever value it might have had as a going business and, consequently, that attempts to mitigate damages would have proven fruitless. (5) The evidence warranted the judge's finding that Porter Square Seafood was owned by Irene Agnastopoulos rather than by an Agnastopoulos family partnership. (6) The portions of the litigation related to defending against the claim for rent and to establishing the claim for tortious interference with a prospectively profitable contractual relationship (a claim we have found it unnecessary separately to discuss) were so intertwined factually with the merits of the claim under c. 93A that the judge would not have been required to segregate out more than a nominal portion of total hours expended by defense counsel in arriving at an appropriate attorney's fee. However, having in mind that one of the traditionally determinative factors in assessing an appropriate fee is the result achieved (see *Cummings* v. *National Shawmut Bank,* 284 Mass. 563, 569 [1933]; *Mulhern* v. *Roach,* 398 Mass. 18, 24, 30 [1986]; S.J.C. Rule 3:07, DR 2-106 [B] [4], as appearing in 382 Mass. 772 [1981]), we think that the excision of penalty damages and related costs makes it now appropriate to reduce the amount awarded to a figure not in excess of the fee (and related costs) actually sought by counsel for Irene Agnastopoulos.

The second numbered paragraph of the judgment is to be amended by (1) substituting $26,150 for $52,300; (2) substituting $8,000 for $11,082.29; and (3) specifying that the recovery is under count 3 of the counterclaim. The judgment shall specify that the defendant take nothing under count 2 of the counterclaim and that count 1 thereof has been waived. As so amended, the judgment is affirmed. The defendant, having succeeded on appeal in sustaining (in part) a recovery under G. L. c. 93A, is to have a supplementary award of attorney's fees and costs on appeal, in an amount to be determined by the trial judge.

*So ordered.*