Kinder, C. Jeffrey, J.
INTRODUCTION
Plaintiff Regional Home Care, Inc., doing business as North Atlantic Medical Services, Inc. (“NAM”), brought this action alleging breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment and unfair and deceptive business practice in violation of G.L. Chapter 93A. Specifically, NAM alleges that IKON failed to deliver the Patient File Archiving System that NAM paid for and that IKON breached or threatened to breach other contracts with NAM in an effort to gain leverage in the dispute. IKON claims that it has fully performed the contract and counterclaims that NAM is in breach for failing to make full payment. Further, IKON claims that NAM violated Chapter 93A by using non-payment as leverage to obtain additional services. A 3-day jury-waived trial concluded on September 9, 2011. For the reasons that follow, judgment will enter for NAM on its claims of breach of contract and unfair and deceptive business practice. As to IKON’s counterclaims, judgment will enter for NAM.
FINDINGS OF FACT
Based upon the relevant, credible evidence admitted at trial and the reasonable inferences drawn therefrom, I find the following facts. Additional facts are reserved as necessary for the rulings of law.
1. The Parties
NAM is in the business of providing sleep apnea, oxygen, and respiratory supplies. It has been in business for 30 years, has 150 employees, and serves the greater New England area.
IKON is an international provider of document management systems and services.
NAM and IKON had a business relationship prior to the contracts at issue in this lawsuit. Since 2003, NAM worked with IKON to lease office equipment, and entered into maintenance agreements with IKON to have that equipment serviced. IKON had previously developed and implemented a so-called “File Magic System” to sort and file various insurance benefit explanations and information. Prior to the disputes at issue in this lawsuit, the relationship between NAM and IKON was satisfactoiy.
2. The Patient File Archiving Project
In April 2007, NAM contacted IKON to solicit its help in developing a solution for archiving patient files. NAM expressed an interest in scanning the files into an electronic system to create more storage space and make filing more efficient. To pursue these goals NAM contacted IKON employee Walter Alves (“Alves”).
In preparation for a meeting with Alves, Cabot Car-abott (“Carabott”), NAM’s President, created a flowchart depicting the forms contained within sleep apnea patient files and showing the workflow, from receiving an order for supplies through conclusion (the “Flowchart”). In the sleep apnea program, three of the documents in each patient’s file are physician-generated; the balance of several documents are internal NAM forms.
Following the late April 2007 meeting with NAM, Alves reviewed the Flowchart and asked to spend a day on-site reviewing NAM’s goals and needs. Following that site visit, on May 2, 2007, NAM and IKON entered into an agreement for IKON to develop proposed solutions. IKON representatives visited NAM’s office and conducted an evaluation. They met with NAM employees and learned NAM’s objectives in implementing a Patient File Archiving System (the “System”).
Matthew Kollmorgen (“Kollmorgen”) of IKON prepared and made a power-point presentation to NAM in August 2007 outlining IKON’s design for the System. While there is a dispute on this point, I conclude that this power-point document was the so-called “Design Document” for the System. Kollmorgen reviewed the Design Document with NAM’s employees *145 on a page by page basis. It was prepared entirely by IKON and was never modified.
The power point presentation provided that separator sheets would be utilized only for the physician-generated forms that are part of each patient’s file, and that IKON would “have control over the layout of the [non-physician-generated] form[s] and can make changes to enable better scanning.” Trial Ex. Nos. 5-5A. The Design Document further states that the non-physician-generated forms “will be redesigned to have bar codes printed on them.” Trial Ex. Nos. 5-5A.
Illustrations in the Design Document show bar codes placed directly on NAM’s forms. Separator sheets would be used only for documents over which NAM had no control, i.e., referrals, prescriptions, and patient demographics. When Kollmorgen reviewed the Design Document with NAM, he told NAM representatives that the documents over which NAM had control would have bar codes on them.
3. The Statement of Work Dispute
IKON prepared a contract known as the Statement of Work (the “SOWj. The SOW incorporated and relied upon the Design Document. It provided, inter alia, that IKON would:
install, configure, and test the solution as defined in the Design Document;
configure all... components according to the specifications in the Design Document;
install, configure, and test all components according to the specifications in the Design Document; and
demonstrate compliance with requirements from the Design Document.
Trial Ex. No. 6. Any changes to the SOW required “a change order executed by both parties.”
The SOW was to include two (2) appendices, the second of which was a “Workflow Design.” There is no Workflow Design appended to the SOW. Other than the Design Document, NAM never saw any document which could be characterized as the Workflow Design. Although the use of bar codes and separator sheets was not set forth in the SOW, that information was contained in the Design Document. The costs associated with the System, as set forth in the Design Document and the SOW, are identical.
In December 2007, IKON representative Brian Kelley (“Kelley”) contacted Kyle Pelletier (“Pelletier”) of NAM to arrange a demonstration of the System, as it then existed. Kelley told Pelletier that the bar coding had not been completed, but they could demonstrate the System using separator sheets for all documents, so NAM could get a sense of how the System was going to work. Following the demonstration on December 18, 2007, Kelley asked Pelletier, as a favor, to sign a Solutions Delivery and Acceptance Form (“SDA”) regarding the SOW. He told Pelletier that if he did not get the SDA signed, he could not get paid, and promised that the bar coding would be placed on NAM’s documents as required by the SOW. Pelletier signed the SDA as a favor to Kelley, relying on his promise.
In January 2008, Carabott inspected the System and observed that it did not comply with the Design Document, as IKON still had not bar coded NAMs internally-generated forms. Instead, the System still required the use of separator sheets for all forms. Carabott brought his concern about this issue to Kelley’s attention.
In March 2008, Don Roche (“Roche”) of IKON contacted Carabott to request a meeting. Roche asked Car-abott to sign a document regarding the System. Carabott stated at the meeting that he had not received the System that NAM had contracted for, citing the fact that bar codes had not been applied to the NAM-controlled forms. Car-abott asked Roche why he should sign off on a document relating to the System when the System did not work. Roche indicated he was getting pressure from his superiors, and asked Carabott to do him a favor by signing the form, promising to get the bar coding done if Carabott would just sign off on the form. IKON conceded that it promised NAM it would look into the bar coding issue following the March 31,2008 meeting. In fact, on April 8, 2008, Roche sent an email to Carabott and Pelletier stating that he had not forgotten about them and was “doing tests ... for barcodes to be incorporated into [NAMs] internal forms design.” Trial Ex. No. 9.
Roche had no further communications with NAM in April or May 2008. In June 2008, Carabott e-mailed Roche, inquiring as to the status of the System, but got no response. In July 2008, Carabott again e-mailed Roche regarding the problem, but received no response. On September 2, 2008, Carabott sent a fax to IKON Financial Services (“IFS”) to seek its help in obtaining completion of the System, and sent a copy of the fax to David Pennie at IKON. Roche responded the same day, apologizing for the delay. Carabott replied the next day, reminding Roche of the promise he made 6 months prior to deliver the System as contracted-for. Roche did not respond.
IKON never presented NAM with a Change Order to provide that separator sheets would be used instead of bar codes on the NAM-controlled forms. IKON has not completed the bar coding and NAM has discarded the System, considering it incomplete and inefficient. NAM has paid IKON $35,050.00 for the System.
5. The Change Order
On December 19, 2007, NAM signed a Change Order for the deliveiy and installation of ten additional FORTIS seats or licenses at NAM (the “Second Change Order”). These additional seats or licenses were necessary to add the workstations necessary for efficient use of the System. The Second Change Order indicated that the cost to NAM for the acquisition and installation of the ten FORTIS licenses was $11,574.00. In January 2008, pursuant to the Second Change Order, IKON acquired and installed at NAM the ten additional *146 FORTIS licenses. On March 31, 2008, NAM signed a document acknowledging that IKON installed the ten additional FORTIS licenses and authorizing IKON to invoice NAM for the purchase and installation of those licenses. On March 31, 2008, IKON issued an invoice to NAM in the amount of $11,574.00 for the work performed pursuant to the Second Change Order (the “Second Change Order Invoice”). NAM never paid the Second Change Order Invoice because IKON did not redesign its forms to include bar codes and the System did not function as described in the Design Document.
6. The Maintenance Agreement
Separate and apart from the SOW and unrelated to the System, NAM and IKON had a contract for the maintenance and servicing of various office copiers (the “Maintenance Agreement”). In the Maintenance Agreement, IKON agreed to service four Ricoh and one Canon copier beginning May 11, 2008 and ending May 10, 2009. NAM leased the five copiers that IKON agreed to service from IKON Financial Services, Inc. (“IFS”), which is a subsidiary of General Electric. In exchange, NAM agreed to make monthly payments to IKON of $864.00 plus any applicable tax. The Maintenance Agreement stated that “Payment terms are net ten days.” Tr. Ex. 7.
The Maintenance Agreement contains the following provision: “Either party may terminate the ‘master’ arrangement contemplated by this Agreement at any time upon prior written notice to the other.” Tr. Ex. 7. IKON issued monthly invoices to NAM pursuant to the Maintenance Agreement beginning on May 11, 2008. In a September 2, 2008, letter NAM faxed to IKON, Carabott wrote: “Having paid $36,142.51 for software and project services and have [sic] not received the patient file archiving system, I will be applying the lease payments of $864 beginning September 1, 2008, until I recover the $36,142.51.” Tr. Ex. 23. In a September 3, 2008 e-mail to Roche, Carabott wrote: “Until IKON provides me with the Patient File Archiving System that I have paid for and that we discussed 6 months ago, all lease payments are on hold.” Tr. Ex. 11. I find that by “lease payments,” Carabott meant the $864 monthly payments that NAM was required to pay IKON pursuant to the Maintenance Agreement. I further find that by these letters Carabott communicated to IKON that until he recovered the amount he felt he was owed under the separate SOW, he would no longer make the $864 monthly payments required under the Maintenance Agreement.
7. The Credit Hold
In September 2008, Joseph Capitummino (“Capitummino”) was the Area Director of Finance for the New England Marketplace at IKON. As of September 2008, NAM was 100 days past due on the Second Change Order Invoice. In September 2008, IKON placed the NAM account on credit hold because NAM was 100 days past due on the Second Change Order Invoice. A “credit hold” is a temporary solution whereby IKON basically freezes an account. Capitummino made the decision to place NAM’s account on credit hold. At the time that he made the decision to place NAM’s account on credit hold, Capitummino was unaware that IKON and NAM were parties to the Maintenance Agreement. The credit Hold had the effect of freezing services under the Maintenance Agreement.
On September 11, 2008, IKON issued an invoice to' NAM for $907.20 pursuant to the Maintenance Agreement. Payment of the September 11, 2008 invoice was due on or before September 21, 2008. NAM did not pay the September 11, 2008 invoice on or before the due date of September 21, 2008. IKON did not issue any invoices to NAM pursuant to the Maintenance Agreement after September 11, 2008.
Rather than hiring another vendor to service the copiers that NAM leased from IFS, NAM leased entirely new copiers from another vendor. After NAM leased copiers from a vendor other than IFS, NAM stopped using the copiers that it leased from IFS and stopped making lease payments to IFS. Between September 29, 2008 and December 8, 2008, NAM sent four checks to IKON, each in the amount of $907.20. NAM received a return payment from IKON of $1,848.40. IKON applied to NAM’s outstanding balance two of the payments that it received from NAM dated between September 29, 2008 and December 8, 2008.
Because NAM secured replacement copiers, the lease agreement with IFS was not paid in full. NAM is claimed to owe approximately $34,000.00 under its lease agreement with IFS.
CONCLUSIONS OF LAW
1. NAM’s Claims
a. Breach of the SOW
NAM claims that it never got what it paid for under the SOW because IKON breached its contractual obligation to redesign NAM’s own forms to include bar codes. IKON concedes that there were discussions of redesigning NAM’s forms to include bar codes, but claims those discussions were not made part of the final contract and are therefore not binding. According to IKON, those discussions are inadmissible parole evidence and the contract’s integration clause precludes consideration of anything beyond the four comers of the final written agreement. I am not persuaded by IKON’S argument.
The parties agree that Pennsylvania law applies as set forth in the SOW. Under Pennsylvania law “the proper construction of a contract does not depend upon the name given it by the parties nor upon any one provision but upon the body of the contract in its entirely and its legal effect as a whole.” Pappas v. Lucas, 181 Pa.Super. 194, 198 (1956), citing Selig v. Phila. Title Ins. Co., 380 Pa. 264 (1955), and Smith-Farms Co. v. Hospital Assn. et al., 313 Pa. 254 (1933). In construing a contract the court will look to its purpose, giving effect to all of its terms. See Pappas v. UNUM Life Ins. Co. of America, 2004 Pa.Super. 310, 856 A.2d 183, 189 (2004); Pappas v. Lucas, 181 Pa.Super. at 198. Justice, common sense, and the probable intention of the parties are guides to the construction of a written *147 contract. See Roth v. Roth, 413 Pa.Super. 88, 91 (1992); Lohmann v. Piczon, 338 Pa.Super. 485, 488 (1985).
In this case the SOW makes numerous references to a “Design Document.” IKON’s obligation under the SOW was to provide hardware, software and services consistent with the Design Document. I conclude from all the evidence that the Design Document referred to in the SOW was the Power Point presentation IKON used to explain to NAM exactly the services and products it intended to provide. Tr. Ex. 5. This construction is consistent with the contemporaneous and uncontroverted statements made during IKON’s presentation of the design of the System. I further condude that IKON intended to incorporate this document in the SOW by referencing it and attaching it as Appendix 2. Their failure to do so does not absolve them of contractual liability. Taken as a whole, the evidence is clear that IKON promised to redesign NAM’s internal documents to include bar codes on the documents. Their written illustrations and verbal explanations of the System communicated this intent directly to NAM. NAM was entitled to rely on these verbal and written promises, and they did, to their detriment.
In order to state a claim for breach of contract under Pennsylvania law, the plaintiff must demonstrate: (1) the existence of a contract to which the plaintiff and defendant are parties; (2) breach of a duty imposed by the contract; and (3) that the plaintiff suffered damages as a result of the breach. See Liss & Marion v. Recordex Acquisition, 603 Pa. 198, 221 (2009). The dispute here is not about the existence of a contract, but about its breach. I conclude that IKON breached the SOW by failing to redesign NAM’s forms to include bar codes and deliver the System in accordance with the SOW and the Design Document.
Under Pennsylvania law, the purpose of damages is to place the non-breaching party “as nearly as possible in the same position [it] would have occupied had there been no breach.” Lambert v. Durallium Products Corp., 72 A.2d 66, 67 (Pa. 1950). The measure of damages is compensation for the loss sustained. See id. I find, from all of the evidence, that the redesign of NAM’s own forms to include bar codes was an integral part of the System that NAM bargained for and, that without the redesign of NAM’s own documents, the System did not function as anticipated. Accordingly, Nam did not receive the functioning system it paid for and was never able to meet its goals of increased storage space and more efficient filing. Therefore, in my judgment, its damages are the $35,050 it paid to IKON for the System.
b.Breach of the Maintenance Agreement
NAM’s September 2 and September 3 communications to IKON in which Carabott clearly stated that he would not make payments under the Maintenance Agreement until the SOW dispute was resolved constituted an anticipatory breach of the Maintenance Agreement and thereby excused IKON’s further performance. The Maintenance Agreement contains a Georgia choice of law provision and the parties agree that Georgia law is controlling. Georgia recognizes the doctrine of anticipatory breach. “The rule is: An absolute refusal by one party to perform an executory contract containing mutual obligations, prior to the date or dates fixed for performance, if such repudiation goes to the whole contract, amounts to a tender of a breach of the contract; and if accepted as such by the opposite party to the contract, it constitutes an anticipatory breach . . .” Jinright v. Russel, 123 Ga.App. 706 (1971). Here, NAM committed an anticipatory breach of the Maintenance Agreement on September 2 and September 3 when it stated that it would no longer perform its primary obligation under the Maintenance Agreement, namely to make monthly payments to IKON. The breach of a material provision of a contract by one party excuses the other from performance. Accordingly, IKON was excused from performance under the Maintenance Agreement after September 2 or September 3 and cannot be liable for breaching the Maintenance Agreement after those dates.
c.Unjust Enrichment
Unjust enrichment is a claim for equitable relief available only in the absence of an adequate remedy at law. See Smith v. Jenkins, 626 F.Sup.2d 155, 170 (D.Mass. 2009) (identifying “the absence of a remedy provided by law” as an element of a claim for unjust enrichment). See also Zarum v. Brass Mill Materials Corp., 334 Mass. 81, 85 (1956) (“The law will not imply a contract where there is an existing express contract covering the same subject matter”). Because I have determined that IKON has breached its contract with NAM and money damages are available as a remedy at law, judgment will enter against NAM on its unjust enrichment claim. Santagate v. Tower, 64 Mass.App.Ct. 324, 329 (2005) (“An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law”).
d.Unfair and Deceptive Business Practice
Unfair and deceptive conduct is discerned from the circumstances of each particular case. See Kattar v. Demoulas, 433 Mass. 1, 14 (2000). A violation of G.L.c. 93A, §11 will be found if the acts complained of fall within the penumbra of some common law, statutory, or other established concept of unfairness, or are immoral, unethical, oppressive, or unscrupulous. See Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc., 403 Mass. 722 (1989); Guity v. Commerce Ins. Co., 36 Mass.App.Ct. 339 (1994) (absence of good faith and presence of extortionate tactics). In deciding questions of unfairness, the Court focuses on the nature of the challenged conduct and on the purpose and effect of that conduct. See Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc., 420 Mass. 39, 42-43 (1995). Here NAM claims that IKON violated G.L.c. 93A in several ways: (1) by promising to complete work it never intended to finish; (2) by inducing NAM to sign documents which it intended to use to justify non-performance of its contractual obligations; (3) by refusing to provide maintenance services under *148 the Maintenance Agreement; and (4) by using a “credit hold” as leverage against NAM. I need address only one. I credit Pelletier’s testimony that when IKON representative Kelley met with her in December 2007 for the purpose of demonstrating the System, Kelley acknowledged that the bar coding of NAM’s documents had not yet been completed, but promised that it would be. Despite his acknowledgment that the work was incomplete, Kelley asked Pelletier, as a favor, to sign a Solutions Delivery and Acceptance Form (“SDA”) regarding the SOW. He told Pelletier that if he did not get the SDA signed, he could not get paid. The SDA contained the following language;
By signing below, Client acknowledges and confirms that the deliverable milestone and/or project referenced above has been completed and all testing and acceptance criteria have been satisfied in all respects as of the date of .this form. Accordingly, IKON is authorized to invoice Client. . .
Tr. Ex. 9. The milestone referred to in the SDA was the “completed installation of the Patient File Archiving System UAT Milestone.” Pelletier signed the SDA as a favor to Kelley, relying on his promise that the bar coding would be completed. I also credit Carabott’s testimony that in another meeting in March 2008, after Carabott’s continued complaints that the bar coding of NAMs documents was not complete, Roche asked him to sign another SDA regarding the System, this one related to the installation of the ten FORTIS seats. When Carabott asked Roche why he should sign off on a document relating to the System when the System did not work, Roche indicated he was getting pressure from his superiors, and asked Carabott to do him a favor by signing the form, promising to get the bar coding done if Carabott would sign off.
Thus, on two separate occasions IKON representatives induced NAM to sign documents that they knew were false. IKON knew that the SDAs were false because Kelley and Roche knew that NAM had not, in fact, “acknowledge(d) and confirmed] that the deliverable milestone and/or project referenced above has been completed and all testing and acceptance criteria have been satisfied in all respects as of the date.” Carabott and Pelletier so certified at the request of IKON’s employees only to move the project to completion. Under these circumstances, IKON’s subsequent reliance on the SDAs to support their position that they had fully performed under the SOW, was unfair and deceptive within the meaning of c. 93A.
To meet the willful or knowing components of the statute for purposes of multiple damages, NAM has the burden of proving that IKON held a subjectively culpable state of mind, which requires more than mere negligence. It contemplates a more purposeful level of culpa-bilily, that is, a conscious disregard for the likely results, and the intentional employment of sharp practices. Whelihan v. Markowski, 37 Mass.App.Ct. 209, 212 (1994); Wasserman v. Agnoastopoulos, 22 Mass.App.Ct. 672, 680-81 (1986). Based on the evidence before me, I am not convinced that either Kelly or Roche knew at the time they induced the execution of the false SDAs that IKON would never complete the bar coding of NAM’s documents. However, IKON acts through its agents and is bound by their knowledge. Accordingly, at the time this dispute came to a head, IKON knew that: (1) IKON had promised that it would redesign NAM’s forms to include bar codes; (2) the bar coding had never been completed; and (3) both Kelley and Roche induced NAM to execute documents they knew to be false with false promises that the bar coding would be completed. And yet IKON relies, in large part, on these documents to justify the position that their obligations under the contract are complete. In my judgment, this is the kind of sharp practice that violates Chapter 93A. I conclude that this conduct was not only unfair and deceptive, it was knowing and willful. NAM is therefore entitled to double damages and attorneys fees.
2. IKON’s Counterclaims a. Breach of the SOW
IKON claims that NAM breached the SOW by failing to pay the Second Change Order Invoice of $11,574 for the ten FORTIS seats. Because I have found that IKON breached the SOW by failing to redesign NAM’s forms to include bar codes as promised, NAM’s performance under the contract was excused as a matter of law. Accordingly, judgment will enter for NAM on this claim.
b. Unfair and Deceptive Practice
IKON claims that NAM’s failure to pay the Second Change Order Invoice of $11,574 for the ten FORTIS seats was solely for the purpose of coercing IKON into redesigning NAM’s forms without charge. Because I have found that NAM’s non-payment was legally justified, I conclude that the failure to pay the Second Change Order Invoice was not an unfair and deceptive practice within the meaning of G.L.c. 93A.
ORDER
For the foregoing reasons, it is ORDERED that judgment shall enter for the plaintiff on its breach of contract claim in the amount of $35,050. Judgment shall enter for the plaintiff on its claim that the defendant committed an unfair and deceptive business practice in violation of G.L.c. 93A. The damages of $35,050 will be doubled and the plaintiff is entitled to recover its attorneys fees. Plaintiffs Counsel will serve its motion for attorneys fees pursuant to Superior Court Rule 9A within 30 days of this order. It is ORDERED that judgment will enter for the defendants on the plaintiffs remaining claims.
It is further ORDERED that judgment will enter for the plaintiffs on the defendant’s counterclaims.