Troy, Paul E., J.
This matter arises over a contract dispute in which C&I Steel, LLC (“C&I”) claims that Peabody Construction Co., Inc. (“Peabody”) has refused to pay C&I for work performed pursuant to a written contract on a construction project for the Alden Elementary School and Arts Theater in Duxbury (“the Project”). C&I asserts claims for breach of contract, breach of the covenant of good faith and fair dealing, quantum meruit, negligence, violations of a payment bond issued pursuant to G.L.c. 149, §29, and violations of G.L.c. 93A. C&I also asserts claims under G.L.c. 149, §29 and G.L.c. 93A, §§2, 11 against Peabody’s surety, Travelers Casualty and Surety Company of America (“Travelers”).
Peabody contends that it does not owe C&I the disputed amounts, because C&I breached the contract through failure to perform on time and defects in performance which resulted in a delay in completion of the project and caused the Town of Duxbury (“Duxbury”) to assess liquidated damages and withhold these damages from its payment to Peabody. Peabody asserts that to the extent there were any defects in the design documents which contributed to C&I’s delays in performance, Peabody as the general contractor only acted as a “pass-through,” and Duxbuiy is responsible for payment of such damages. *403 Peabody has filed a third-party complaint against Duxbury and C&I’s surety, the Continental Insurance Company (“Continental”), alleging violations of G.L.c. 149, §29 and G.L.c. 93A, §§2, 11.
This matter is before the court on Continental’s motion for summary judgment. After a hearing, the court ALLOWS the third-party defendant’s motion for summary judgment.

BACKGROUND

The following undisputed facts are taken from the summary judgment record. Peabody was the general contractor on Duxbury’s renovation of the Alden Elementary School and Arts Theater. Drummey Rosane Anderson, Inc. (“DRA”) was the project architect and approved or rejected work on the project. Travelers issued a performance bond for Peabody, with Duxbuiy as its obligee. On August 14, 2001, C&I and Peabody entered into a subcontract in which C&I agreed to perform $378,000 in miscellaneous metals and ornamental iron work. Continental, as C&I’s surety, issued a performance bond on the Project with Peabody as its obligee. Peabody then issued change order 1 in which C&I agreed to perform $1,742,000 of structural steel work on the Project. C&I asserts that Peabody ordered it to perform an additional $1,389,746 in change order work during the course of the project. Peabody contends that the additional work was caused by C&I’s delayed or initially inadequate performance. C&I claims that it performed a total of $3,509,746 of work on the project, and has been paid $1,342,420.
Continental’s performance bond provides, in pertinent part:
[I]f the subcontractor shall faithfully perform and fulfill the subcontract... and shall fully reimburse and repay the General Contractor all outlay and expense which the General Contractor may incur in making good any such default . . . then this obligation shall be null and void . . .
Whenever the Subcontractor shall be, and declared by the General Contractor to be in default under the Subcontract, the General Contractor having performed its obligations hereunder, the Surety shall, if required in writing by the General Contractor, either
(i) promptly remedy the default; or
(ii) promptly complete the Subcontract;
(iii) promptly obtain bid or bids for submission to General Contractor for completing the Subcontract.
Throughout much of C&I’s work on the Project, Peabody and C&I had ongoing disputes about C&I’s performance on the Project. C&I claimed that the specifications Peabody provided were inadequate and that Peabody mismanaged the Project. Peabody claimed that C&I did not adequately staff the Project and did not complete work on a timely basis. On August 27, 2002 Peabody sent C&I a letter stating, in pertinent part,
Please be advised that Peabody Construction Co, Inc. (“Peabody”) and its Subcontractors are being severely damaged by your lack of performance on the above referenced project. You are hereby directed to have an erection crew and crane on site no later than August 28, 2002 at 7:00 A.M. This erection crew and crane (the third erector of this job) are directed to resume erection on 8/28/02 and perform all work continuously and to have all erection completed in the Performing Arts Center (“PAC”) no later than September 25, 2002. Any and all costs attributed to your firm not being able to man this project properly, will be diligently pursued with your bonding company.
Peabody has repeatedly requested wind posts for the PAC building to no avail. Be advised, Peabody is ordering and will erect the referenced wind posts and back charge your contract accordingly.
Peabody can no longer tolerate your complete disregard of the construction schedule and the terms and conditions of your contract with Peabody. Your firm is in default of your contract with Peabody. Therefor, if you do not comply with the schedulé and terms of your contract Peabody will terminate your contract in seven (7) days.
It is neither Peabody’s intention nor our desire to terminate your contract. We sincerely wish for C&I to comply with all terms and conditions of their contract with Peabody.
Joan C. Clements (“Clements”), an authorized representative from Continental, responded to this letter on August 27, 2002. Clements’ letter acknowledged receiving a copy of the letter and requested a variety of documents in order to investigate the issues. Her letter stated that it was sent for purposes of investigation only and should not be construed as an admission of liability or a promise to pay. It also demanded that Peabody strictly comply with all of the terms of the bond, the contract, and all applicable statutes. Following these letters, Continental and Peabody had a number of meetings and phone conversations.
On September 23, 2002, after discussions between Peabody and C&I, Peabody sent Continental a letter which stated
PCCI does not wish to exercise the performance and payment conditions of the contract in order to motivate C&I Steel to perform, but will if required. PCCI’s 9/27/02 notification of contract default and potential termination has initiated an action by C&I Steel, Inc. to take a proactive role and at this time C&I is erecting steel at the PAC complex. PCCI will closely monitor C&I Steel to ensure the PAC phase of the project progresses without interruptions due to C&I performance issues.
*404 Continental responded to Peabody’s letter on September 30, 2002, stating that “there does not appear to be either a default or termination and Continental Insurance Company (’CIC’) construes your letter as an admission of same. CIC does not therefore intend to take any further action in this regard.” The record does not contain any documents showing that Peabody replied to this letter.
On October 21, 2002, John Paulding (“Paulding”) of Peabody sent Ronald Votta (“Votta”) of C&I a letter stating that
Peabody has been notified that effective today C&I Steel has ceased all activities in erecting structural and miscellaneous steel and has removed equipment/cranes from the Alden Elementary School Job site ... Failure of C&I Steel to properly manage their contract continues to impede the on time delivery of critical components required to complete their contract . . . This correspondence is C&I Steel’s 48 hour notice to comply with the Contract requirements. Failure to comply with this notice is C&I Steel’s seven day notice of contract default.
[Emphasis in original.)
Also on October 21, 2002, Peabody sent a letter to Clements, informing her that Peabody had received a request for payment from C&I Steel’s subcontractor for ornamental metal work. The letter stated, in pertinent part
This demand for payment from Cl Steel’s subcontractor encumbers PCCI from further payments to C&I Steel without express written direction from CNA. Henceforth PCCI must receive from C&I Steel all material and subcontractor lien releases for PCCI’s payment to C&I steel to date. PCCI’s third notice (12/210/02) [sic] to CNA regarding C&I Steel performance and subcontractors demands necessitates this action requesting CNA [Continental] to authorize payment. PCCI reserves all rights allowed in the Peabody Construction Co, Inc./Cape and Island Steel Inc. contract for the Alden School Project.
The record includes a memorandum of agenda for a meeting on Peabody’s premises on November 19, 2002, which Clements attended, along with representatives from Peabody and C&I, to discuss ways to resolve the ongoing performance issues. The record also contains numerous examples of correspondence between Peabody and C&I, in which Peabody expresses its dissatisfaction with C&I’s delays in performance and urges C&I to speed up its work or to meet specific project deadlines, and C&I contends that Peabody’s mismanagement and DRA’s inadequate specifications caused its delay. The record indicates that Peabody forwarded copies of this correspondence to Continental.
A letter from Peabody to C&I dated November 26, 2002 states that “Cl Steel is not staffing the Alden Project to meet the PCC schedule . . . [which] is seriously impacting the light metal gage and masomy installations. C&I is aware of the sequence of work and must complete welding of the wind bracing on column A North elevation to allow sub trades to proceed with contract work.” An email dated December 2, 2002, from Fred Schultz of Peabody to Ray Lemming (“Lemming”), who replaced Clements as Continental’s representative to Peabody in October 2002, reads, “Just want to bring you up to date on C&I steel [sic] We still have no schedule for Alden School and they are behind on the dates given at the meeting with Joan [sic] Westford the same holds true for this project [sic] Both projects are going to back charge C&I for winter conditions, we have been trying to mitigate damages for months but we need the help of your client to do so [sic] Please advise and help [sic].”
On December 6, 2002, C&I sent Peabody a letter proposing a twenty-man schedule and stating that the schedule was contingent upon weather conditions being adequate during the scheduled work. The letter concludes, “look forward to our meeting next Friday, December 13, to resolve some outstanding issues and move forward into the new year with a positive working relationship between our two companies.” On January 13, 2003, Peabody wrote to C&I that C&I had not met milestone dates from its December 6, 2002 letter, therefore “jeopardizing the July 15, 2002 substantial completion date.” This letter states that Peabody has rescheduled the “filed sub roof subcontractor to begin work on the PAC on January 20, 2003.” It requests an answer as to why C&I had allowed deck material to remain bundled on the roof joist for seven weeks before its scheduled installation, only to find that the metal deck supplier had furnished incorrect material. The letter requires that “C&I must complete all work associated with the roof on or before January 17, 2003 so as to not further delay this critical activity.” On January 16, 2003, Peabody sent C&I a letter about unacceptable fire proofing and gypsum sheathing. It states that C&I must redo this work at no extra cost to Peabody. It also states that C&I must complete all work associated with the roof on or before January 17, 2003.
Peabody and C&I continued to dispute work requirements and scheduling throughout the winter of 2003, and Peabody continued to send copies of its correspondence with C&I to Continental. On February 25, 2003, David Calhoun of Peabody sent an email regarding an earlier conversation with Continental about the “pending defaults of C&I Steel” in which Continental requests that Peabody “continue to withhold payment of contract funds until the Surety has an opportunity to investigate this situation.” On March 17, 2003, Peabody responded to C&I’s memorandum, noting that although C&I disputes the back charge for the fireproofing, Peabody “takes exception to your dispute” and “will maintain the backcharge against the C&I account.” On March 27, 2003, Pea *405 body wrote to C&I that its “failure to complete moment welds” is forcing “trades to work out of sequence.” C&I replied that it was waiting for the area to be accessible, and Peabody countered that C&I was in error, because the area had been “accessible for weeks.” Peabody’s letter continued, “PCCI, Cape & Islands, DRA and the Town of Duxbury can argue from now to eternity about who is at fault. However, Cape & Islands is only hurting itself by not supplying the necessary manpower to compete the outstanding structural steel and miscellaneous metals work on the project.” The letter concludes, “[y]our immediate attention and focus on completing the remaining work on the project is required.”
In a memorandum on April 2, 2003, Peabody notified C&I that, “as discussed in the field on March 28, 2003, Cape & Island will be responsible for all repair work to the conduit at the stage. PCCI will forward these costs once they are received from Griffin Electric.” C&I sent a memorandum to Peabody on May 8, 2003, asserting that rates for another subcontractor to perform moment welds are “reasonable” but that it “sees no need for overtime.” The letter adds, “We see no reason to be charged a Peabody mark up as we had moment people available, including Arc Force. Your memo doesn’t address this issue so we assume there isn’t a mark up.” Peabody replied on May 9, 2003:
PCCI has reviewed Cape & Island’s May 8, 2003 memo concerning Arc Force’ Rates and offers the following comments. At this time, PCCI does not see the need for any overtime. However, if the situation does arrive that a minimal amount of overtime is required so that subsequent work is not delayed any further, overtime hours will be utilized. Arc Force is performing moment weld connections. Cape & Island will most definitely be charged a Peabody Construction markup, as well as the direction supervision cost required for this work. Cape & Island has not had moment welders people available on a continual basis for weeks and this is the reason why Arc Force had be brought in. If Cape & Island requires certified payroll for Arc Forces, be advised that this will only add additional cost to be deducted from Cape & Island’s contract.
In addition to copies of Peabody’s letters to C&I, on February 13, 2003, Peabody’s counsel sent a letter to Continental, discussing delays in C&I’s performance. In its answers to interrogatories, Peabody asserts that this letter constitutes its formal, written notice to Continental of C&I’s default. The letter provides, in pertinent part:
This is to advise you that your Principal, C&I Steel, Inc., has failed to complete its work in accordance with the contract documents and its schedule on the Project. As a result of its failure to complete its work, the awarding authority has placed Peabody Construction Co, Inc. on notice of its intent to assess liquidated damages in the event that the project is not substantially completed on time. In order to avoid these liquidated damages, Peabody Construction Co., Inc. may need to accelerate its work, as well as those of other subcontract trades on this Project. Be advised that there may not be sufficient funds in the account of your Principal in order to fully compensate Peabody for any costs that it incurs, including liquidated damages which arise out of, or relate to, the failure of your Principal to perform its contract in accordance with the terms thereof and in a timely manner.
We urge you, as Surety, to become involved with your Principal and Peabody in expediting the completion of this project, so as to mitigate any damages which all parties could incur. Peabody will welcome a meeting with you and your principal as soon as possible to attempt to resolve these issues.
Lemming testified in his affidavit that subsequent to Continental’s receipt of this letter, he had a phone conversation with Edward F. Vena (“Vena”), Peabody’s counsel, on February 23, 2003. He advised Vena of Peabody’s earlier letter and conversations in the fall of 2002 in which Peabody stated that it wanted C&I to continue working on the Project. Lemming stated in his affidavit that he asked Vena whether Peabody was declaring C&I in default and making a demand on Continental, and that Vena replied that it was not. Vena asserted in his affidavit that he never said C&I was not in default. Much of Vena’s affidavit repeats the statements in his letter, both citing to the letter and using similar language. Vena claimed that during the phone conversation he “(u]rged Continental to supplement C&I’s work” in order to “mitigate any damages.” Vena does not dispute that he did not ask Continental to perform under its bond. Vena also stated in his affidavit that the purpose of the phone conversation was “not to discuss termination of C&I Steel.”
On June 3, 2003, after completing its work on the Project and not receiving the payment it claims it is owed, C&I commenced this action against Peabody, Travelers, and DRA. The parties later agreed to remove DRA from the litigation. Peabody then filed a third-party complaint against Continental, asserting a claim for violations of performance on its bond, pursuant to G.L.c. 149, §29, as well as a claim for unfair and deceptive practices under G.L.c. 93A. This matter is before the court on Continental’s motion for summary judgment.

DISCUSSION

Summary judgment is appropriate where there are no material facts in dispute, and the moving party is entitled to judgment as a matter of law. Mass.R.Civ. 56(c); McLaughlin v. CGU Ins. Co., 445 Mass. 815, 818 (2006); Kourouvacilis v. General Motors Corp., 410 Mass 706, 711-12, 714 (1991). In order to defeat a motion for summary judgment, the non-moving party must offer evidence of specific material facts in dispute that create a genuine issue for trial. Pederson v. Time, 404 Mass 14, 16-17 (1989). Hypotheses, vague allega *406 tions, conclusoiy statements, and unsupported inferences do not meet this burden. Scofield v. Berman & Sons, Inc., 393 Mass. 95, 103 (1984); First Nat’l Bank of Boston v. Slade, 379 Mass. 243, 245-46 (1979). Where the moving party will not have the burden of proof at trial, he or she may show the absence of a triable issue of fact by demonstrating that the non-moving party has no reasonable expectation of proving an essential element of its case. Kouravacilis, 410 Mass. at 716. In deciding a motion for summary judgment, this court must draw all reasonable inferences in the light most favorable to the non-moving party. Giarardi v. Gabriel, 38 Mass.App.Ct. 553, 554 (1995).

Count I, Violations of G.L.c. 149, §29

Government officials contracting for public construction projects are required to obtain performance and payment bonds pursuant to G.L.c. 149, §29, which provides, in relevant part:
Officers or agents contracting in behalf of the commonwealth or in behalf of any county, city, town, district or other political subdivision of the commonwealth or other public instrumentality for the construction, reconstruction, alteration, remodeling, repair or demolition of public buildings or other public works when the amount of the contract in the case of the commonwealth is more than five thousand dollars, and in any other case is more than two thousand dollars, shall obtain security by bond in an amount not less than one half of the total contract price, for payment by the contractor and subcontractors for labor performed or furnished and materials used or employed therein . ..
In order to obtain the benefit of such bond for any amount claimed due and unpaid at any time, any claimant having a contractual relationship with the contractor principal furnishing the bond, who has not been paid in full for any amount claimed due for the labor, materials, equipment, appliances or transportation included in the paragraph (1) coverage within sixty-five days after the due date for same, shall have the right to enforce any such claim (a) by filing a petition in equity within one year after the day on which such claimant last performed the labor or furnished the labor, materials, equipment, appliances or transportation included in the claim and (b) by prosecuting the claim thereafter by trial in the superior court to final adjudication and execution for the sums justly due the claimant as provided in this section.
Any claimant having a contractual relationship with a subcontractor performing labor or both performing labor and furnishing materials pursuant to a contract with the general contractor but no contractual relationship with the contractor principal furnishing the bond shall have the right to enforce any such claim as provided in subparagraphs (a) and (b) of paragraph (2) only if such claimant gives written notice to the contractor principal within sixty-five days after the day on which the claimant last performed the labor or furnished the labor, materials, equipment, appliances or transportation included in the paragraphs (1) coverage, stating with substantial accuracy the amount claimed, the name of the party for whom such labor was performed or such labor, materials, equipment, appliances or transportation were furnished; provided, that any such claimant shall have the right to enforce any part of a claim covering specially fabricated material included in the paragraph (1) coverage only if such claimant has given the contractor principal written notice of the placement of the order and the amount thereof not later than twenty days after receiving the final approval in writing for the use of the material. The notices provided for in this paragraph (3) shall be served by mailing the same by registered or certified mail postage prepaid in an envelope addressed to the contractor principal at any place at which the contractor principal maintains an office or conducts his business, or at the contractor principal’s residence, or in any manner in which civil process may be served.
Continental argues that Peabody cannot succeed in establishing its claim under G.L.c. 149, §29, because Peabody never complied with the mandatory notice provisions of Continental’s performance bond. Continental claims that Peabody never formally notified it that C&I was in default under the bond, and that Peabody never required it to perform under the bond. Pursuant to a letter from Peabody on August 27, 2002, Continental asserts that it investigated a dispute that had arisen between C&I and Peabody, determined that no default existed, and that it had no obligation to perform under the bond. Continental contends that, subsequent to that investigation and prior to commencement of this litigation, Peabody had notified Continental in writing that it did not consider C&I in default, and did not want to take default action against C&I. Continental asserts that it then notified Peabody in writing, that, based on Peabody’s representation that C&I was not in default, Continental would take no further action in the matter. Continental contends in its affidavits that it determined after ongoing investigation in the fall of 2002 and the winter of 2003 that there was a good faith dispute between Peabody and C&I regarding contract requirements, charge backs, scheduling, and other factual issues, and that neither party had found the other in material breach of the contract. Continental also claims that Peabody never found C&I in default, and that C&I completed its work on the original subcontract for miscellaneous metal and ornamental iron work, as well as on change order 1, the structural steel work, so that Continental was not required to perform under the terms of the performance bond.
Peabody claims that it made a proper demand to Continental requesting that Continental cure C&I's default. Peabody contends that on October 21, 2002, it notified C&I that C&I was on 48-hour notice of default and that it also sent a letter to Continental that day *407 notifying it of delays in C&I's performance. Peabody also asserts that it sent a “written demand letter” to Continental, through its attorney, on February 13, 2003. Moreover, Peabody contends that Continental was well aware of C&I’s ongoing delays in performance, which Peabody claims represents its default, because of the copies of correspondence between Peabody and C&I that Peabody forwarded to Continental. Peabody asserts that Continental has therefore not been prejudiced by any deficiencies in the demand letter.[3]
A condition precedent is an event which must occur before a contract becomes effective or before a party is obligated to perform under the contract. Massachusetts Municipal Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 45-46 (1991). If the condition is not met, a party’s obligation to perform is unenforceable. Id. Whether a contract provision is a condition precedent or a warranty is a question of law. See Drake Fishing, Inc. v. Clarendon American Ins. Co., 136 F.3d 851, 853 (1st Cir. 1998); Shaw v. Commercial Ins. Co., 359 Mass. 601, 605-06, (1971). In determining if a contract contains a condition precedent, courts consider the parties’ intent, the contract as a whole, and the surrounding circumstances. Massachusetts Municipal Wholesale Elec. Co., 411 Mass at 45-46. To create a condition precedent usually requires “emphatic words, ” but courts may find a condition precedent exists based on the intent of the parties, whether or not emphatic or precise words are used. Id. at 46. The conduct of the parties after signing the agreement is indicative of their intent. Id. at 59.
Section 2 of Continental’s performance bond plainly and unequivocally states:
Whenever the Subcontractor shall be, and declared by the General Contractor to be in default under the Subcontract, the General Contractor having performed its obligations hereunder, the Surety shall, if required in writing by the General Contractor, either
(i) promptly remedy the default; or
(ii) promptly complete the Subcontract;
(iii) promptly obtain bid or bids for submission to General Contractor for completing the Subcontract.
The plain terms of the bond here indicate that Peabody must first declare C&I in default, and then provide Continental written notice of C&I’s default and make a written demand for Continental’s performance, before Continental is obliged to take any of the specified actions. Section 2 provides that once Continental receives such notification and demand, it must then take one of three actions. It is required to either: cure the defect, complete the subcontract, or present bids from other subcontractors to Peabody. The language here, on its face, plainly requires that written notice of C&I’s actual, not potential, default, and a written demand for performance, is a condition precedent to Continental’s obligation to perform.
A party bringing an action pursuant to a bond must show strict compliance with the terms of the bond. Simplex Time Recorder Co., Inc. v. Federal Ins. Co., 37 Mass.App.Ct. 947, 947 (1994); General Elec. Co. v. Lexington Constr. Co., 363 Mass. 122, 123-24 (1973). See, e.g., Salem Bldg. Supply Co., Inc. v. J.B.L. Construction Co., Inc., 10 Mass.App.Ct. 360, 363 (1980) (holding that supplier’s rights under bond should be determined by terms of bond itself, which required notice to two of three named parties, in private construction project); U.S. Fidelity & Guaranty Co v. N.J.B. Prime Investors, 6 Mass.App.Ct. 455, 459 (1978) (where plaintiff had not made payments “strictly in accordance with the terms” of the construction contract, the surety was not obligated by the terms of the bond to make payments under the bond).
Compliance with the statutory notice requirement is a condition precedent to a subcontractor maintaining an action on the contractor’s payment bond pursuant to G.L.c. 149, §29. Bastianelli v. National Union Fire Ins. Co., 36 Mass.App.Ct. 367, 369-70 (1994) (allowing sub-subcontractor’s invoice sent to generad contractor as sufficient notice under G.L.c. 149, §29, and holding that any form of notice by sub-subcontractor to subcontractor, as long as it shows amount claimed and name of party, meets requirements to recover for work performed by sub-subcontractor). Whether notice is timely is a question of law for the court. See Carter v. Commonwealth, 290 Mass. 97, 101 (1935) (holding that it is a question of law to determine last day of work performed under a construction contract, and thus whether notice was filed within the statutoiy period). See also Carter Pile Driving, Inc. v. U.S. Fidelity & Guaranty Co., 52 Mass.App.Ct. 1107, *2 (2001) (unpublished opinion); Ross v. Plant Insurance Co., 361 Mass. 852, 852-53 (1972).
Premature notice, given before the last date on which a contractor provided labor and materials, is insufficient to meet the requirements of G.L.c. 149, §29. International Heating & Air Conditioning Corp. v. Rich Constr. Co., 372 Mass. 134, 139 (1977); Worcester Air Conditioning Co. v. Commercial Union Ins. Co., 14 Mass.App.Ct. 352, 355 (1982). Notice given after the sixty-five-day statutoiy period or no notice at all is also insufficient. Continental Bronze Co. v. Salvo & Armstrong Steel Co., 8 Mass.App.Ct. 799, 800, n.2 (1979) (holding Continental Bronze forfeited rights of recovery because it gave notice after the 65-day notice period). See also Carter Pile Driving, 52 Mass.App.Ct. at *2 (2001) (holding that notice sent before completion of the work is ineffective under G.L.c. 149, §29).
The Appeals Court has determined that a surety could not be held liable on its payment bond in light of a supplier’s failure to give timely statutoiy notice to the general contractor of its claim of payment due from a subcontractor, and that the surety was not estopped from denying its liability for lack of statutory notice. Barboza v. Aetna Casualty & Surety Co., 18 Mass.App.Ct. 323, *408 327-28 (1984). The Barboza court noted that it should give a “broad or liberal construction” of G.L.c. 149, §29 to accomplish its intended purpose of affording security to subcontractors. The court determined, however, that it “ill serves the statutory scheme” and could “stimulate litigation” if the court ignored “the simple statutory prerequisite” of notice “upon which all parties in public contracting, including the sureties, presumably rely. In the case of a materialman’s or sub-subcontractors’ claim against a payment bond for what is due from a subcontractor, that prerequisite is to give a written notice of claim to the general contractor within sixty-five days after the day on which the claimant last supplied work or materials. That notice is to state with substantial accuracy the amount claimed and the name of the party to whom the work and materials were furnished . . . We do not think the requirements of §29 can be altered by private agreement against a surety not shown to have waived compliance with statutory requirements.”
Peabody relies on Bayer & Mingolla Construction Co., v. Deschenes, 348 Mass. 594, 598-602 (1965), which held that a compensated surety was not discharged because of a general contractor and a subcontractor’s agreement to extend their contract deadlines without notifying the surety, as well as by a lack of timely notice of the subcontractor’s later default, because the court determined that the surety was not prejudiced by the delay. Before it notified the surely of the subcontractor’s default, two months after the subcontractor left the job, the general contractor had finished most of the subcontractor’s work. The court found that the surely was not harmed by the general contractor completing the work, because the surety would have had to pay someone to do the work in any case. The court ruled that the surely could not be discharged of its liability because it was not prejudiced by the lack of notice.
The performance bond in Bayer & Mignolla required the surety to pay claims for labor and materials, “subject ... to the following express conditions [among others] ... (2) That upon receipt of written notice from . . . [Bayer] of [Deschenes’s] default... [Aetna] shall have the right within thirty... days after the receipt of such notice to remedy the default or to proceed, or procure others to proceed, with the performance of such [subcontract; that if . . . [Aetna] does proceed or procure others to proceed with the performance of such [subcontract... all money that may at the time of such default be due, or that thereafter [may] become due to . . . [Deschenes] under said [subcontract shall become due and payable to [Aetna] and . . . [Aetna] shall be subrogated to all the rights of. . . [Deschenes].” Id. at 596.
The court in Bayer & Mingolla ruled that the terms of the performance bond did not expressly require notice to the surety, and that the language implying a notice requirement only required the surety to be notified “within a reasonable time.” The court found an implied notice requirement existed so that the surety would have an opportunity to decide whether it would complete the subcontractor’s work “as a method of minimizing its own loss.” Id at 600. The court concluded, however, that “[Compensated sureties... ought not to be relieved from their obligations on merely technical grounds, not affecting substantially the character of the undertaking which they assumed.”
Continental relies on two first circuit cases, decided almost forty years after Bayer & Mingolla, both of which discuss Bayer & Mingolla but which require notice to the surety before the surely is obligated to perform under its bond. Continental cites Seaboard Sun Co. v. Town of Greenfield, 370 F.3d. 215, 220-24 (1st Cir. 2004) (finding no “clear, direct and unequivocal” demand notice despite a lengthy series of letters between the surety and the town discussing how and whether the surely would complete a middle school construction project after its principal was terminated from the project), and Enterprise Capital, Inc. v. San-Gra Corp., 284 F.Sup.2d 166, 177 (D.Mass 2003) (finding no merit in argument that general contractor was relieved from notice requirement because surely was aware that subcontractor had failed to perform its job, and holding that the “[s]even-day notice requirement in the Construction Contract exists precisely to provide the surety an opportunity to protect itself against loss by participating in the selection of the successor contractor to ensure that the lowest bidder is hired and damages mitigated . . . Courts have consistently held that an obligee’s action that deprives a surety of its ability to protect itself pursuant to performance options granted under a Performance Bond constitutes a material breach, which renders the bond null and void”).
In Seaboard the court determined that the notice provision offers an opportunity for the surety to cure the breach and thus mitigate its damages, and that any notice must be stated in “clear, direct and unequivocal language.” The court noted the Town of Greenfield’s reliance on Bayer & Mingolla, which held that lack of prompt notice to the compensated surety of a contractor’s default does not discharge the surety if it is not harmed. The court also discussed Enterprise Capital, 284 F.Sup.2d at 180, which held that notice requirements “exist [ ] precisely to provide the surety an opportunity to protect itself against loss by participating the in the selection of the successor contractor to ensure that the lowest bidder is hired and damages mitigated.” The Seaboard court determined that the notice requirement provides a critical opportunity for a surety to cure the breach and thus mitigate its damages. The court ruled that even if a surety must show injury, loss, or prejudice, the surely in question had “[met] this hurdle, given its deprivation of mitigation opportunities.”
In Seaboard the subcontractor had left the job and the surety had to decide whether to take over the work itself or let the school hire a new team, which might significantly increase costs. The court held that an “obligee’s action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material *409 breach, which renders the bond null and void.” Citing Carey v. Planning Bd. of Revere, 335 Mass. 746, 748 (1957), and Commissioner of Corps. & Taxation v. Springfield, 321 Mass. 31, 35 (1947), the court held that notice of default must be stated in “clear, direct and unequivocal language” in order to “serve the purpose of the statutory notice provision at issue.” Id. at 223.
The surety, the town of Greenfield, and the general contractor in Seaboard had exchanged a series of letters and held a series of negotiations discussing various proposals for whether and how the surety would take over the work on the project. The court determined that these negotiations did not serve as notice of default. The Town of Greenfield argued that its efforts to work toward a compromise should “not be held against it,” contending that its efforts “to obtain even dilatory performance” did not excuse the surety from “its contractual duty to act promptly.” The court determined, however, that the town’s continuing efforts at compromise did not excuse it from its obligation to provide “an additional written notice of default” as required under the performance bond. Id. at n.2. The court also dismissed the Town of Greenfield’s argument that the surety’s description of one of the town’s letters to the surety as “call[ing] upon Seaboard to undertake completion” of the school construction project, and its response that it was willing to do so, provided notice that the fifteen-day period before the surety would be deemed in default had begun. Id.
In Enterprise Capital, the court determined that the general contractor’s failure to meet conditions precedent in the performance bond, which were that the general contractor declare that subcontractor was in default or formally terminate the subcontractor’s contractual rights, meant that the surety had no obligation to perform. Enterprise Capital, 284 F.Sup.2d at 179. After considering a series of letters sent by the general contractor over four months, the court found that the subcontractor was never adequately terminated, because there was no “clear, direct and unequivocal notice of termination.” Id. The court held that the general contractor “must declare the default, terminate the principal, and notify the surety,” before the surely became obligated to perform.
Among the letters from the general contractor to the surety which the Enterprise court considered was one stating that the general contractor would “proceed to procure the completion of the project.” The court determined that this letter “did not clearly foreclose” the subcontractor from performing. “To the contrary, it requested participation by [the sub] in furtherance of that end.” The court also stated that because the letter referred to the subcontractor in the present tense, it was not clear, direct, and unequivocal notice. The court found that a subsequent letter declared the subcontractor was in default and was terminated, but held that this letter still did not provide clear, direct and unequivocal notice of termination to the surety, because the letter was addressed to the surety, not the subcontractor, and the letter contained inaccurate statements claiming an earlier letter requested termination, which the court found did not do so. The court further ruled that the next letter provided clear, direct, and unequivocal notice to the surety of the termination of the subcontractor, but, since it was not also sent to the subcontractor, the subcontractor was unaware of the termination, so the subcontractor did not receive the required clear, direct, and unequivocal notice of termination. The court found that this series of letters did not meet the statutory notice requirements. Id. at 180-81.
Peabody argues that the performance bond in the case at bar is “substantially similar” to the bond in Bayer & Mingolla. The bond here, however, unlike the bond in Bayer & Mingolla, plainly states on its face that notice and a written demand for performance is a mandatory prerequisite before performance is required. Peabody also claims that Continental had “notice of its principal’s default” because of the copies of correspondence between Peabody and C&I which Peabody alleges it forwarded to Continental. Peabody asserts in its opposition to Continental’s motion that the copies of its correspondence provided adequate notice of C&I’s “ongoing delays and failures to meet schedule deadlines.” Despite Peabody’s assertions, the language of the letters in the case at bar is far less indicative of an existing default and a demand for the surety’s performance than the letters the Seaboard and Enterprise courts found to be inadequate notice. On the two occasions in August 2002 and October 2002 when Peabody notified C&I that it would beta default within a set period of time if it did not return to work, C&I took actions that Peabody requested, and Peabody’s subsequent correspondence reflects that C&I had returned to the job. In September 2002, Peabody explicitly stated that it “does not wish to exercise the Performance and payment conditions of the Contract in order to motivate C&I Steel to perform, but will if required.”
The other correspondence between Peabody and C&I not only does not show that Peabody had any intention of terminating C&I, it plainly states that Peabody is requiring C&I to correct inadequate work and to continue work on the Project. In January 2003, Peabody notified C&l that C&I must correct work on the fireproofing, at no additional cost to Peabody. In March 2003, Peabody notified C&I that its failure to complete moment welding was causing other trades to work “out of sequence,” while C&I replied that it was unable to obtain access to the areas which required moment welding. Peabody’s letter to C&I concluded, “[y]our immediate attention and focus on completing the remaining work on the project is required.” In April 2003, Peabody told C&I that it was responsible to correct work on the conduit on the stage, and that these costs would be charged to the C&I account. In May 2003, when Peabody notified C&I that it was using supplemental labor to *410 speed up the work, Peabody also stated that the costs for this labor would be taken from the contract amount payable to C&I. None of these statements “plainly and unequivocally” indicate that C&I is in default, that Peabody intends to terminate C&I’s contract, or that Peabody is requesting Continental’s performance on the bond. To the contrary, these letters indicate that Peabody wishes C&I to continue working on the Project and that C&I has been continuing to do so.
In its answers to interrogatories, Peabody contends that its letter of February 13, 2003 constitutes a written demand notice under the terms of the bond, and that this letter is its sole written demand. The letter on its face cannot be termed a “clear and unequivocal” statement of default or a demand that Continental perform under the terms of the bond. The letter discusses situations which may occur at some time in the future, if C&I fails to complete its work. The letter states that because of C&I’s delays, Duxbury “has placed Peabody Construction Co., Inc. on notice of its intent to assess liquidated damages in the event that the project is not substantially completed on time.” The letter makes clear that Peabody seeks to avoid these potential liquidated damages, by “accelerat[ing] its work, as well as those of other subcontract trades on this Project.”
Nothing in this letter shows a current intent to terminate C&I. Peabody asserts speculatively that there “may not be sufficient funds in the account of your Principal in order to fully compensate Peabody for any costs that it incurs, including liquidated damages.” Peabody then “urges” that Continental “become involved with your Principal and Peabody in expediting the completion of this project, so as to mitigate any damages which all parties could incur. Peabody will welcome a meeting with you and your principal as soon as possible to attempt to resolve these issues.” The statements that Peabody “will welcome a meeting” and that Continental is “urged” to “become involved” with C&I are not clearly and unequivocally a demand for performance. The statements that all parties “could incur” damages “in the event that the project is not substantially completed on time” is also not a direct and unequivocal statement of current default. Quite the contrary, the letter explicitly states that Peabody wants C&I to continue working on the Project, but to expedite its work. According to Vena’s affidavit, at the February 25, 2003 phone conference between Peabody and C&I subsequent to this letter, he “urged Continental to supplement Cl’s work in order to ’’mitigate any damages." Vena states in affidavit that the purpose of the conference call was “not to discuss termination of C&I Steel.”
Peabody contends that Continental was not harmed even if the court finds its demand letter to be inadequate, because Continental was well aware of the ongoing issues with C&I’s performance, and thus that Continental cannot avoid its obligations under the bond because of a lack of written notice. Unlike the cases cited supra, Peabody never terminated C&I, and C&I completed performance of its work on the Project. Therefore, Continental had no reason to step in and hire another subcontractor or to perform -C&Ts work itself. The ongoing mutual allegations of mismanagement by Peabody and C&I support Continental’s assertion that it had investigated the issues, found no material breach, and concluded that a genuine, good-faith dispute existed between the parties. In September 2002, after its initial investigation, Continental informed Peabody in writing that based on Peabody’s own assertion that C&I was not in default and it did not want C&I terminated from the Project, Continental had no liability and was taking no further action. Peabody did not dispute this letter. Again in October 2002 and February 2003, after Peabody sent letters stating that C&I could become in default, Continental investigated the issues and Peabody then stated that it did not want to terminate C&I from the Project. Both Peabody’s and C&I’s subsequent actions show that they did not treat each other as in material breach. C&I continued to perform the work specified in the contract, and Peabody required that C&I correct work it deemed inadequate at no additional cost. In addition to their letters, the parties’ behavior confirmed Peabody’s statements to Continental that it did not want to terminate C&I.
In Bayer & Mingolla, the court stated that the absence of a specific notice requirement in the bond “strongly suggests that no investigation” by the surely was contemplated, other than a mechanism for reducing the surety’s costs by making sure that any default by the subcontractor would not cost more than the amount for which the surety itself could do the work. The court discussed a split in prior case law, with some courts requiring compensated sureties to perform on their bonds, notwithstanding the violation of a provision for notice of default, if the violation had caused no harm to the surety, and other courts treating the notice provision as an express condition and discharging the surety if the contractor did not strictly comply with any express or implied notice requirements. Bayer & Mingolla, 348 Mass. at 600-02. The court concluded, “We hold that, in the circumstances, [surety] was not discharged by [general’s] failure to give prompt notice of [sub’s] default, where [surety] has not been harmed. We need not discuss to what extent a different result would be necessary if [surety] had been caused damage by nonperformance of Condition (2) or if the notice of default had been for the purpose (a) of investigating whether liability had arisen, or (b) of preventing loss of evidence of further loss, or (c) of avoiding other appreciable damage to the surety.” Id. at 603. See also Gilmour v. Standard Sun & Cas. Co., 292 Mass. 205, 210-11, cited with approval by Bayer & Mingolla, 348 Mass. at 603.
Here, Continental’s bond does contain an express notice provision, unlike the bond in Bayer & Mingolla. Continental’s statements and actions show that the provision is included so that Continental has an opportunity to investigate whether or not a liability has arisen, *411 and so that it may prevent further loss. On three occasions during the course of the Project, when notified of a potential future default, Continental investigated Peabody’s claims and determined that it had no liability. Plainly, had Peabody notified it of an existing default, Continental would have been able to more fully investigate, while all of the subcontractors were available on the job site, determine whether it had incurred any liability, and, if so, how best to reduce its harm.
Peabody’s correspondence with C&I in the winter and spring of 2003 provided Continental no notice of anything other than both parties continuing to work on the Project, encountering routine construction delays, and making necessary corrections. According to its affidavit, Continental believed that Peabody was forwarding “all correspondence” between the parties. The plain terms of the performance bond require Peabody to demand performance directly from Continental, in writing, after declaring C&I in default. The notice provision allows Continental to investigate any alleged claims, and determine its liability, at a time when adequate evidence is available, all parties are on-site, and it could potentially correct the problem or limit its damages. Lack of any opportunity to investigate its liability plainly harms Continental. Therefore, because of Peabody’s failure to comply with the explicit notice provision in the performance bond, Continental should be granted summary judgment on Count I.

Count II, Violations of G.L.c. 93A

Unfair acts in the conduct of trade or business are unlawful under G.L.c. 93A, §2(a). Those engaged in trade or commerce are also protected against unfair business practices. G.L. 93A, §11; Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 779 (1986). Conduct which disregards known contractual arrangements, and is intended to secure benefits for the breaching party, constitutes an unfair act or practice under G.L.c. 93A. See Anthony’s Pier Four, Inc. v. H.B.C. Associates, 411 Mass. 451, 474 (1991) citing Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 857 (1986).
Conduct undertaken to destroy the rights of another party to an agreement, under certain circumstances, can warrant a finding of unfair acts or practices. Massachusetts Employer’s Ins. Exchange v. Propac-Mass., Inc., 420 Mass. 39, 43 (1995). In determining whether conduct constitutes an unfair act or practice, this court must focus on the nature of the challenged conduct and the purpose and effect of that conduct. G.L.c. 93A, §2; Massachusetts Employer’s Ins. Exchange, 420 Mass. at 49. To rise to the level of an unfair act or practice, a parly’s conduct must violate some common law, statutory or other established concept of fairness, must be unethical or unscrupulous, and must cause substantial injury to the consumer or business. Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 679 (1996), citing P.M.P. Associates, Inc., v. Globe Newspaper Co., 366 Mass. 593, 596 (1975).
The crucial factors in making a determination of fairness under G.L.c. 93A are the nature of the challenged conduct and the purpose and effect of that conduct. Massachusetts Employer’s Ins. Exchange, 420 Mass. at 42-43. Given the standards of the commercial marketplace, conduct does not qualify as unethical or unscrupulous “unless it attains a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce.” Wasserman, 22 Mass.App.Ct. at 679, quoting Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498 (1979).
Nothing in the record here indicates that Continental acted with any degree of unfairness or unscrupulousness. The record shows that Continental promptly began an investigation of Peabody’s August 27, 2002 allegations of C&I’s delay. The investigation was detailed and extensive, involving numerous meetings, phone conversations, and correspondence between the parties. Peabody’s September 23, 2002 written statement that it “does not wish to exercise the Performance and payment conditions of the Contract in order to motivate C&I Steel to perform, but will if required,” plainly states that Peabody is not requiring Continental’s performance. Continental subsequently determined that C&I was not in default, based on Peabody’s own statements that C&I had returned to work on the project and that it did not want to declare C&I in default, and notified Peabody in writing of its determination. Peabody did not dispute this conclusion. The record indicates that Continental continued to monitor Peabody’s correspondence about the Project, after Peabody’s “48 hour notice” to C&I in October 2002, and attended a meeting in November 2002 at Peabody’s offices. The parties agree that Continental promptly held a phone conference with Peabody in response to Peabody’s February 2003 letter warning of potential liquidated damages if the Project was not completed on schedule. Although Peabody disputes Continental’s affidavit that it explicitly asked if Peabody was declaring C&I to be in default during that conference, and that Peabody said no, the parties do not dispute that Peabody stated at that time that it was not terminating C&I from the Project.
Peabody’s and C&I’s actions during the winter of 2002 and the spring of 2003 show that the parties did not consider C&I in default or terminated from the Project. Peabody repeatedly advised C&I of particular work that it wanted completed or redone, with specific completion dates, and told C&I that extra costs would be charged to C&I’s account. Except for the February 13, 2003 letter stating that funds “might” be inadequate to “fully compensate Peabody for any costs” that it incurs “in the event that the project is not completed on time” and the Town of Duxbury chooses to assess liquidated damages, none of Peabody’s communications in the record indicate that there were inadequate funds in the C&I account from which Peabody could deduct these costs. Numerous letters after February 23, 2003 indicate that Peabody *412 continued to deduct chargebacks from its payments to C&I, although C&I at times disputed the necessity of those chargebacks, and that funds continued to be available for these charges from the contract amount which Peabody and C&I had initially agreed. It is undisputed that C&I was never terminated from the Project, and completed its work before June 2003. Moreover, C&I’s decision to pursue the instant litigation indicates its good-faith belief that the chargebacks were in error and that Peabody owes it additional, payments under the contract. Thus, Continental’s investigation into Peabody’s allegations appears reasonable.
Continental also asserts that it had determined there was a good faith dispute between Peabody and its principal, C&I. Based on letters between the parties in the record, this determination was reasonable. In March, when Peabody asserted that C&I was delayed in moment welding, C&I responded that the areas requiring welding were inaccessible. In May, C&I disputed Peabody’s decision to hire additional moment welders because Peabody contended that C&I’s had not been available “on a continual basis for weeks” claiming that, contrary to Peábody’s assertions, it had welders available during that time-frame. C&I also replied to Peabody’s allegations of delay that its delays were caused by Peabody’s mismanagement of the project, failure to provide access to certain areas of the site, and inadequate specifications in the project plans. Peabody itself acknowledged the ongoing dispute about the cause of the delays, stating “PCCI, Cape & islands, DRA and the Town of Duxbury can argue from now to eternity about who is at fault. However, Cape & Islands is only hurting itself by not supplying the necessary manpower to compete the outstanding structural steel and miscellaneous metals work on the project.”
The terms of the bond Continental signed with Peabody clearly and unambiguously state that Peabody must provide written notice of C&I’s default before Continental has an obligation to perform under the bond. It was not unethical or an unfair business practice for Continental to insist that Peabody abide by the terms of its written contract and provide written notice of C&I’s default, a condition precedent to Continental’s obligation to perform.
While summary judgment is disfavored on a claim involving intention or a party’s state of mind, Quincy Mutual Fire Ins. Co. v. Abernathy, 393 Mass. 81, 86 (1984), it is appropriate in a G.L. 93A claim where the issues may be decided as a matter of law. Enterprise Capital, 284 F.Sup.2d at 181 (finding no liability for a G.L.c. 93A action where the court held the surely had no liability on the bond, and determining as a matter of law the surety’s actions were not unfair or deceptive); Chub v. Electric Ins. Co., 17 Mass.App.Ct 61, 61 (1983). Here, summary judgment is appropriate given this court’s determination that Continental had no obligation to perform under the bond. Acting in accordance with the terms of its contract cannot be construed as Continental acting unfairly or deceptively. Therefore, Continental’s motion for summary judgment on Count n should be allowed.

ORDER

For the foregoing reasons, it is hereby ordered that third-party defendant Continental’s motion for summary judgment is ALLOWED.

Peabody also argues that Continental’s motion for summary judgment should not be allowed because it was filed late, more than 30 days after the dose of discovery. The record shows, however, that discovery delays earlier in this litigation resulted from Peabody’s own actions, such as its delay in answering discovery requests for over one year. The record indicates that both parties agreed to extend the discovery period, including taking depositions, for several months after expiration of the discovery deadline, despite the already extended March 22, 2006 deadline in the tracking order, and without seeking an additional extension from the court. The court (Connor, J.) had extended the discovery deadline to March 22, 2006 because of Peabody’s “3rd or 4th” change in counsel, which the court found had prejudiced the plaintiff. At the same time, the court also extended all other tracking order deadlines by 90 days. The record also indicates that Continental delayed in filing a motion to compel several times in the winter of 2005 and the spring of 2006 because of Peabody s change in counsel. Continental eventually filed its motion to compel on June 2, 2006; a hearing on this motion was scheduled for November 6, 2006. Continental then filed its motion for summary judgment on August 3, 2006, well before the trial date.
Pursuant to Mass.R.Civ.P. 56(a), a party “seeking to recover upon a claim may, ... at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, . . . move for a summary judgment in his favor.” The Supreme Judicial Court has determined that the requirements of Standing Order 1-88, including compliance with tracking orders, are permitted only where they are “not inconsistent” with the Massachusetts Rules of Civil Procedure. Sullivan v. Iantosca, 409 Mass. 796, 800-02 (1997) (allowing amendment of the complaint outside the time provided in the tracking order because of Mass.R.Civ.P. 15’s provisions that leave to amend should be “freely given”).
Considering all of the circumstances in the matter at bar, and the provisions of Mass.R.Civ.P. 56(a) that a plaintiff may file a motion for summaiy judgment "at any time,” this court, in its discretion, declines to follow the defendants’ urging and deny Continental’s motion on the grounds that it was not timely filed. Allowing Continental’s motion is consistent with Standing Order 1-88’s purpose of just and speedy handling of civil matters. See Terespolsky v. Law Offices of Stephanie K. Meilman, Civil No. 1077, 17 Mass. L. Rptr. 317, 2004 WL 333606, *4 (Super.Ct. February 23, 2004) (Garsh, J.) (treating plaintiffs motion for summaiy judgment as a motion to amend outside of tracking order deadline and allowing the motion, because it would not prejudice the defendant, while criticizing the parties’ failure to comply with the tracking order); Johnson v. Cooke, Civil No. 000050, 17 Mass. L. Rptr. 517, 2004 WL 856606, *4 (Super.Ct. March 1, 2004) (McCann, J.), (allowing defendant’s motion for summaiy judgment which was filed, without leave of court, outside the tracking order deadline). Moreover, Peabody, the party responsible for substantial discoveiy delays in the instant litigation, should not now be heard to claim that Continental’s motion is untimely.